## GENERAL ELECTRIC CO. v. FEDERAL RADIO COMMISSION (two cases).

## PEOPLE OF STATE OF NEW YORK v. FEDERAL RADIO COMMISSION.

Court of Appeals of District of Columbia.
Submitted December 4, 1928. Decided February 25, 1929.

Petition for Rehearing Denied March 9, 1929.

Nos. 4870, 4871, 4880.

In No. 4870:

Frank J. Hogan, of Washington, D. C., Stephen H. Philbin and Charles E. Hughes, both of New York City, and John W. Guider, of Washington, D. C., for appellant.

In No. 4871:

Henry S. Manley, of Delmar, N. Y., for appellant.

In No. 4880:

John W. Guider and Frank J. Hogan, both of Washington, D. C., and Charles E. Hughes, of New York City, for appellant.

In Nos. 4870, 4871, 4880:

Louis G. Caldwell, of Chicago, Ill., Donald D. Hughes, of Dayton, Ohio, and Bethuel M. Webster, Jr., Sp. Asst. to Atty. Gen., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

MARTIN, Chief Justice. These appeals are brought under section 16 of the Radio Act of 1927 (44 Stat. 1169 [47 USCA § 96]), for a review of a decision of the Federal Radio Commission whereby the commission refused the application of appellant for a renewal of its broadcasting license, dated November 1, 1927, for the operation of station WGY, located at Schenectady, N. Y., with permission to use 50 KW power, at a frequency of 790 kilocycles, and without limitation as to time of operation. The novelty of this subject justifies a preliminary reference to the controlling statutes, and also a

statement of certain elementary facts, drawn in part from the record and in part from common knowledge and public history.

The electric impulses which carry sounds when broadcast proceed through the "ether" in waves which move at a distance of 300,-000,000 meters per second. The length of the waves may be measured by scientific instruments, likewise the number of waves produced each second; the latter measurement is called the "frequency" of a station, the former its "wave length." A vast demand is made for the use of the ether for various purposes, of which broadcasting is only one. In the present state of the art the broadcasting band is limited to frequencies extending from 550 to 1,500 kilocycles per second, or, if stated in wave lengths, from 545 to 200 meters. It is conceded that, in order to avoid interference between stations when broadcasting at the same time, there should be a difference of 10 kilocycles between the frequencies respectively employed by them; otherwise they will interfere with one another and cannot be clearly distinguished by the receiver. It follows that there are but 96 practicable frequencies, or so-called wave channels, employed in broadcasting as at present carried on. Six of these channels have been set aside for the exclusive use of stations in Canada, with the result that only 90 remain for use in the United States.

It is agreed that certain broadcasting stations, employing high power, should be recognized as national, and be given the exclusive use of appropriate frequency bands, in order to avoid interference with one another and with smaller stations; while certain other stations, recognized as regional or local, operate with less power, and for this reason, and because of relative geographical locations, may operate with the same frequency without serious interference with one another. It is well known that the time of day or night which may be allotted to a broadcasting station is a factor of importance in its operation. Owing to the fact that the sun's rays absorb the broadcasting waves, there is less interference among stations in the daytime than at night. The greater audiences, however, listen in to radio programs between sundown and midnight, and from September until March, and accordingly that period is the most advantageous for operation.

On August 13, 1912, Congress passed "An act to regulate radio communication" (37 Stat. 302), which was the first general law upon the subject, and was in force from its date until the passage of the act of 1927.

The art of broadcasting, however, as now understood, had not then been developed, as appears from the following extract from the report of the Senate committee upon the bill:

"The term 'radio communication' instead of 'radio telegraphy' is used throughout the bill, so that its provisions will cover the possibility of the commercial development of radio telephony. Section 6, p. 14. Experiments have been made here and abroad for some years in carrying the human voice on Hertzian waves, but with only limited and occasional results. Radio telephony involves the application of the same principles as are involved in inventions to enable apparatus to select and record accurately one message on a given wave length out of a mass of messages on various lengths. When this latter result has been attained—an unfulfilled promise of some years' standing—radio telephony will quickly follow. The bill is framed to be adjusted to that improvement when it comes, but in the meantime it deals with the art as it exists to-day." Senate Report 698, Sixty-Second Congress, Second Session, pp. 5, 7.

The "unfulfilled promise" thus referred to was finally fulfilled, and the first broadcasting station in the United States was constructed in the year 1920. Other similar stations rapidly followed, and, owing to the lack of effective regulation under the act of 1912, a chaotic condition known as the "breakdown of the law" ensued, and the usefulness of the art was for the time being seriously impaired.

In order to correct this condition Congress enacted the Act of February 23, 1927, entitled "An act for the regulation of radio communications, and for other purposes" (44 Stat. 1162 [47 USCA § 81 et seq.]). This act, which is yet in force, forbids all radio broadcasting in this country, except under and in accordance with a license granted under the provisions of the act. For the purposes of the act the United States is divided into five zones, the first zone including the state of New York and certain other Northeastern states, while the fifth zone includes the state of California and certain other Western states. The act establishes the Federal Radio Commission, with power to classify radio stations, to prescribe the nature of the service or class of stations, to assign bands of frequencies or wave lengths to the various stations or classes of stations, and determine the power which each station shall use and the time during which it shall operate, to determine the location of

classes of stations or individual stations, and to make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the purposes of the act, provided, however, that changes in the wave lengths, authorized power, in the character of emitted signals, or in the times of operation of any station, shall not be made without the consent of the station licensee unless, in the judgment of the commission, such changes will promote public convenience or interest, or will serve public necessity or more fully comply with the provisions of the act. The act provides that the licensing authority, if public convenience, interest, or necessity will be served thereby, subject to the limitations of the act, shall grant to any applicant therefor a station license provided for by the act, and that in considering applications for licenses, when and in so far as there is a demand for the same, the licensing authority shall make such a distribution of licenses, bands of frequency, or wave lengths, periods of time for operation, and of power among the different states and communities as to give fair, efficient, and equitable radio service to each of the same.

The act provides that no license for the operation of a broadcasting station shall be for a longer term than three years, and upon the expiration of any license, upon application therefor, a renewal of such license may be granted from time to time for a term of not to exceed 3 years; and no renewal of an existing station license shall be granted more than 30 days prior to the expiration of the original license. The act also provides that if upon examination of any application for a station license, or for the renewal or modification of such a license, the licensing authority shall determine that public interest, convenience, or necessity would be served by the granting thereof, it shall authorize the issuance, renewal, or modification thereof in accordance with its finding; but if the licensing authority, upon examination of any such application, does not reach such decision with respect thereto, it shall notify the applicant thereof, and shall fix and give notice of a time and place for hearing thereon, and shall afford such applicant an opportunity to be heard under such rules and regulations as it may prescribe.

The act also provides that any applicant for the renewal of an existing station license, whose application is refused by the licensing authority (in this case the Federal Radio Commission) shall have the right to appeal from such decision to this court, by filing with the court within 20 days after the decision complained of is effective, notice in writing of the appeal and of the reasons therefor; that the licensing authority shall be notified of the appeal by service upon it, prior to the filing thereof, of a certified copy of the appeal and of the reasons therefor; and within 20 days after the filing of the appeal the licensing authority shall file with the court the papers and evidence presented to it upon the original application for a permit or license, and a copy of its decision thereon and a full statement in writing of the facts and the grounds for the decision as found and given by it; that the court may order the taking of additional evidence in such manner as it may deem proper; that the court shall hear, review, and determine the appeal upon the record and evidence, "and may alter or revise the decision appealed from and enter such judgment as to it may seem just."

By force of an amending act, known as the Davis Act, passed March 28, 1928 (45 Stat. 373), it is provided that the people of all the zones established by the act of 1927 "are entitled to equality of radio broadcasting service, both of transmission and of reception, and in order to provide said equality the licensing authority shall as nearly as possible make and maintain an equal allocation of broadcasting licenses, of bands of frequency or wave lengths, of periods of time for operation, and of station power, to each of said zones when and in so far as there are applications therefor, and shall make a fair and equitable allocation of licenses, wave lengths, time for operation, and station power to each of the states, the District of Columbia, the territories and possessions of the United States within each zone, according to population," and that "the licensing authority shall carry into effect the equality of broadcasting service hereinbefore directed, whenever necessary or proper, by granting or refusing licenses or renewals of licenses, by changing periods of time for operation, and by increasing or decreasing station power, when applications are made for licenses or renewals of licenses." Act Feb. 23, 1927, § 9, as amended by Act March 28, 1928, § 5 (47 USCA § 89).

The General Electric Company was first licensed to operate station WGY, on February 4, 1922, under the act of 1912. The license was for three months; the power, 1,500 watts; the frequency, 832.8 kilocycles, corresponding to a wave length of 360 meters. Thereafter, during successive periods of three months each, the company applied for and was granted renewals of its

licenses, each for the period of three months. By the renewal of May 21, 1923, it was assigned a frequency of 790 kilocycles, which it has had ever since, although at times the same frequency has been concurrently used by other licensed stations. The station power was gradually advanced by successive renewals from 1,500 watts to 50,000 watts, with greater power allowed for experimental purposes. On June 1, 1927, the first license issued to the company under the act of 1927 was received by it. This license was for the period ending July 31, 1927, and granted a frequency of 790 kilocycles, the time to be shared with station WHAZ. On September 15, 1927, a renewal license was issued to the company for the term ending October 14, 1927, frequency 790 kilocycles, power 50,000 watts, time of operation to be shared with station WHAZ. On November 1, 1927, a similar renewal license was granted the company for the term ending December 31, 1927, with the same frequency and power, but with unlimited time of operation.

The licenses issued under the act of 1927 contained the following term: "This license is issued under and in accordance with the Radio Act of 1927, and all of the terms and conditions thereof are made a part hereof as though specifically set out in full herein." By certain General Orders of the commission the license dated November 1, 1927, was extended until November 11, 1928, being a period slightly in excess of one year. On January 14, 1928, the company filed an application for a renewal of this license. On October 12, 1928, the commission authorized a revision of the allocation of all broadcasting stations, to take effect on November 11, 1928. By the terms of this revision WGY was granted a frequency of 790 kilocycles and power of 50,000 watts as before, subject to the limitation that the station was to share this frequency with station KGO, Oakland, Cal., and was not to operate after sunset at the latter station. This would require WGY to cease operating at the following average times throughout the year, to wit: During the month of January, at 8:17 o'clock; February, 8:48; March, 9:18; April, 9:47; May, 10:17; June, 10:32; July, 10:28; August, 10; September, 9:16; October, 8:32; November, 8:01; December, 7:56. Station KGO, Oakland, Cal., also belongs to the General Electric Company, and operates with a power of 10,000 watts. The commission's order accordingly granted a cleared or exclusive channel of 790 kilocycles for the use of the two stations, granting KGO full time of operation, and WGY limited time at night

as aforesaid. Appeals 4870 and 4871 herein were filed on November 9, 1928. Appeal 4880 was filed on November 30, 1928. They present the same issue, and, while the earlier appeals may have been premature, the last appeal conforms to the rules and is regular.

█ The appellant rightly contends that the refusal of the commission to renew its license, except as modified with respect to the time of operation, amounted to a refusal of a renewal within the sense of the act of 1927; and appellant contests the commission's action upon a claim (1) that it wrongfully deprives appellant of its property rights by preventing the full time operation of station WGY; and (2) that in fact the public convenience, interest, and necessity will be served by renewing appellant's former license with unrestricted time of operation, and will not be served by the modification aforesaid.

██ In respect to appellant's first contention we may say that, under the commerce clause of the Constitution (article 1, § 8, cl. 3), Congress has the power to provide for the reasonable regulation of the use and operation of radio stations in this country, and to establish agencies such as the Federal Radio Commission to give effect to that authority. Without such national regulation of radio, a condition of chaos in the air would follow, and this peculiar public utility, which possesses such incalculable value for the social, economical, and political welfare of the people, and for the service of the government, would become practically useless. Davis, Law of Radio, p. 71; Zollman, Law of the Air, pp. 102, 103.

Reference is made in appellee's brief to a decision by Judge Wilkerson in White v. Federal Radio Commission, 29 F.(2d) 113, United States District Court, Chicago, wherein it is said: "The construction of plaintiff's plant and its operation under the licenses obtained prior to the Act of February 23, 1927, did not create property rights which may be asserted against the regulatory power of the United States, if that power is properly exercised." The terms and conditions of the various licenses received and enjoyed by appellant as herein recited also tend to confirm the view that, if the time limitation imposed by the commission upon WGY be reasonable and such as to serve the public convenience, interest, or necessity, the order should be sustained; otherwise, it should be overruled.

█ Upon this point, however, we feel that the contention of the appellant should be sustained. It appears that station WGY represents a large investment of capital, said

to be $1,500,000, adventured in part during the pioneer stages of broadcasting, and that the station has been one of the most important development stations in the country; that through its enterprise important and valuable apparatus has been developed, which has greatly advanced the art of broadcasting; that it has been one of three stations recognized in this country as "development broadcasting stations"; and that at present it carries on great experimental work of this character in the public interest. It appears that within 100 miles of the station there is a very large population, both urban and rural, estimated to number more than 2,000,000 persons, residing in the states of New York, Massachusetts, Vermont, and New Hampshire, who in large part are dependent upon this station for reliable and regular broadcasting service, and that, if the station should be silenced during the early hours of the evening, as determined by the commission, the general public within this territory would be seriously prejudiced. In view of the service to the art hitherto rendered by WGY, and still continued by it, with the resulting advantage to the public, and in view, also, of the "public convenience, interest, and necessity" of so great a constituency for full-time operation of the station, it appears that the restriction complained of is not reasonable and should not be enforced.

The considerations inducing the action of the commission are fully set out in the record. When the commission commenced its official services under the act of 1927, and undertook to bring order out of the chaos then prevailing in broadcasting, it decided that the public convenience, interest, and necessity required that not more than 40 of the 90 available broadcasting frequency channels should be maintained as cleared channels for the exclusive use of the high-powered national broadcasting stations, and that the remaining 50 channels should be reserved for regional and local broadcasting. Accordingly, under the Davis amendment of March 28, 1928, the commission divided the 40 cleared channels equally among the five broadcasting zones, allocating 8 to each zone. In making this allocation the commission assigned the frequency of 790 kilocycles to station KGO, Oakland, Cal., as a cleared channel for use by it without time limitation, and assigned the same frequency to station WGY, but forbidding its use by the latter in the evening hours after sunset at station KGO.

It is contended in support of this allocation that it is an essential part of a general system for the regulation of broadcasting throughout the country; that the system was adopted after thorough investigation of the situation, with the aid of competent radio engineers; and that the granting of a frequency of 790 kilocycles to WGY without time limitation would destroy the system as a whole, thereby producing great confusion. It is argued, also, that such an order would have the result of giving the first zone 9 cleared full-time channels, instead of 8, which is the number allocated to each of the other zones.

We have but little information concerning station KGO, except that it operates on a power of 10,000 watts, and that it also is owned by the General Electric Company. It must be assumed that WGY, operating in the evening with a power of 50,000 watts, would at certain distances interfere with the broadcasting of KGO, with its smaller power. It does not appear however that this interference would compare in point of public inconvenience with that resulting from the silencing of WGY after sunset at Oakland, nor that full-time operation in the evening by WGY with 790 kilocycles would seriously impair the general scheme of allocations otherwise adopted by the commission. We are convinced that the public interest would be enhanced by granting full time to the latter station.

It is the judgment of this court, therefore, that the appellant, the General Electric Company, was on November 11, 1928, and is now, entitled to receive from the Federal Radio Commission a renewal of its license to operate station WGY upon the same terms as those contained in the license dated November 1, 1928, to wit, upon 790 kilocycles, with power of 50 KW, and without time limit for operation, and this cause is remanded to the Federal Radio Commission to carry this judgment into effect. Costs assessed against appellee.