325 F.2d 637
 The GOODWILL STATIONS, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Transcontinent Television Corporation, Midwest Radio-Television, Inc., American Broadcasting-Paramount Theatres, Inc., and WXYZ, Inc., Intervenors.
WGN, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
Transcontinent Television Corporation, Midwest Radio-Television, Inc., American Broadcasting-Paramount Theatres, Inc., and WLS, Inc., Intervenors.
The GOODWILL STATIONS, INC., and WGN, Inc., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,
City of New York Municipal Broadcasting System, American Broadcasting-Paramount Theatres, Inc., WXYZ, Inc., and WLS, Inc., Westinghouse Broadcasting Company, Inc., Transcontinent Television Corporation, and Midwest Radio-Television, Inc., Intervenors.
 Nos. 17498-17500.
 United States Court of Appeals District of Columbia District.
 Argued September 10, 1963.
 Decided October 31, 1963.
 
 Mr. R. Russell Eagan, Washington, D.C., with whom Reed T. Rollo and Kelley E. Griffith, Washington, D. C., were on the brief, for appellants in Nos. 17498 and 17499 and petitioners in No. 17500.
 Mrs. Ruth V. Reel, Counsel, Federal Communications Commission, with whom Messrs. Max D. Paglin, General Counsel, Daniel R. Ohlbaum, Associate General Counsel, Herman I. Branse, Counsel, Federal Communications Commission, and Lionel Kestenbaum, Attorney, Department of Justice, were on the brief, for respondents.
 
 
 1
 Mr. Ernest W. Jennes, Washington, D. C., with whom Thaddeus Holt, Jr., Washington, D. C., was on the brief, for intervenor, Transcontinent Television Corporation.
 
 
 2
 Messrs. Peter Shuebruk and Herbert M. Schulkind, Washington, D. C., were on the brief, for intervenor, Midwest Radio-Television, Inc.
 
 
 3
 Messrs. James A. McKenna, Jr., and Vernon L. Wilkinson, Washington, D. C., were on the brief, for intervenors, American Broadcasting-Paramount Theatres, Inc., WXYZ, Inc. and WLS, Inc.
 
 
 4
 Messrs. Charles S. Rhyne, Thomas P. Brown, III, and Alfred J. Tighe, Jr., Washington, D. C., were on the brief, for intervenor, City of New York Municipal Broadcasting System, in No. 17500.
 
 
 5
 Mr. John W. Steen, New York City, was on the brief, for intervenor, Westinghouse Broadcasting Company, Inc., in No. 17500.
 
 
 6
 Before FAHY, BURGER and WRIGHT, Circuit Judges.
 
 
 7
 FAHY, Circuit Judge.
 
 
 8
 In 1945 the Commission instituted a rule making hearing, designated as Docket No. 6741, to explore the possibility of improving and extending radio service in areas of the country that did not receive primary groundwave standard broadcast service.[1] These areas, referred to as "white areas", are dependent for nighttime standard broadcast service upon a secondary service afforded by skywave signals provided by the so-called "clear channel" stations, especially the twenty-five Class I-A clear channel stations with which these proceedings are primarily concerned. Appellants, The Goodwill Stations, Inc., and WGN, Inc., are, respectively, licensees of Class I-A clear channel stations WJR (760 kc) Detroit, Michigan, and WGN (720 kc) Chicago, Illinois. Class I-A clear channel stations are able to provide an extensive nighttime secondary service because the frequencies on which they operate are reserved at night for their exclusive use, thus freeing them from interference by co-channel stations. Like other stations, however, they are not allowed to operate at a power in excess of 50 kw.
 
 
 9
 Throughout the 1945 proceedings two conflicting proposals were advanced to improve the service to the "white areas." One was that the Commission authorize the clear channel stations to operate at a power in excess of the 50 kw limit, thereby increasing their range of effective service. It was also proposed that the Commission provide a first nighttime primary service to as much of the "white area" as possible by authorizing additional unlimited time stations to operate on the frequencies hitherto reserved for the exclusive nighttime use of the existing clear channel stations. Although the proceedings continued into 1948 the Commission was unable to arrive at a final conclusion by that time.
 
 
 10
 No further action was taken until April 15, 1958, when the Commission issued a Further Notice of Proposed Rule Making in which it requested comments on several proposals, including (a) the authorization of an additional unlimited time station on thirteen of the Class I-A frequencies; and (b) the maintenance of the status quo of the remaining Class I-A frequencies. The Commission again deferred decision as to the desirability of removing the 50 kw power ceiling. Appellants opposed both proposals and advocated the removal of the 50 kw power ceiling for all clear channel stations.
 
 
 11
 On September 22, 1959, the Commission issued a Third Notice of Further Proposed Rule Making requesting comments on (a) deferral of any decision on the removal of the 50 kw power limit; and (b) the authorization of one additional unlimited time station on twenty-three of the clear channel frequencies, including those assigned to WGN and WJR.[2] Again WGN and WJR opposed, and reiterated their previous position.
 
 
 12
 On September 13, 1961, the Commission adopted a Report and Order[3] finally terminating the proceeding by amending its rules, to be effective October 30, 1961, to authorize additional fulltime stations on thirteen of the twenty-five Class I-A frequencies, including those assigned to WGN and WJR (WGN was to share the nighttime use of 720kc with a station to be located in either Nevada or Idaho, and WJR was to share the nighttime use of 760 kc with a station to be located in San Diego, California). The Commission also deferred for further consideration any decision as to a removal of the 50 kw power ceiling.[4] Authorization of the additional stations, however, was subject to the provision that such stations were to protect the 0.1 mv/m daytime groundwave contour and the 0.5 mv/m nighttime 50 per cent skywave service contour of the dominant clear channel stations.
 
 
 13
 The Commission gave specific reasons for its choice of each of the thirteen duplicated stations and the twelve nonduplicated ones. It stated that eleven of the additional stations, including the one to operate on WGN's frequency, were authorized in order that a first nighttime primary service might be provided to areas which hitherto had been without such service. As to WJR the Commission stated that duplication on its frequency was necessary to provide a substitute frequency for Station KFMB, San Diego, California, whose previous frequency had been assigned to Mexico as a Class I-A clear channel under the terms of a 1961 agreement with that country, thereby precluding its further use by KFMB.
 
 
 14
 Moreover, as to each of the clear channel stations which would thenceforth be forced to share the nighttime use of its frequency the Commission was of the opinion that there would be no substantial loss in the skywave service which those stations were presently able to provide the "white areas." This was based on the finding that the limited amount of skywave service beyond the protected 0.5 mv/m 50 per cent skywave contour which might be subjected to interference was of a low order of effectiveness and there were a number of other available services in the areas in which such interference might occur. The Commission was also of the opinion that the authorization of the additional stations would not substantially reduce the potential for improving skywave service to "white areas" through the use of power in excess of 50 kw should that be authorized in the future. In this regard the Commission stated that it had retained the status quo of a sufficient number of clear channel stations to bring a total of four skywave services to practically the entire United States in the event higher power were subsequently authorized.
 
 
 15
 As to its decision to defer further any resolution of the higher power question, the Commission stated that although it was feasible to expand skywave services by authorizing higher power there were certain social and economic objections to its use by a few stations, and these objections had not been sufficiently met to enable the Commission to say at this time that the use of higher power was in the public interest.[5]
 
 
 16
 Appellants filed Petitions for Reconsideration and Requests for an Evidentiary Hearing, contending, inter alia, that the Commission order authorizing additional full-time stations on their frequencies amounted to a modification of their licenses, requiring an adjudicatory, evidentiary hearing. They also filed applications for authority to increase their power to 750 kw, and petitioned for a waiver of the Commission's rules barring such applications.
 
 
 17
 On November 21, 1962, the Commission adopted two Memorandum Opinions and Orders, one reaffirming its Report and Order of September 13, 1961, and denying appellants' Requests for an Evidentiary Hearing and their Petitions for Reconsideration,[6] the other returning their applications for higher power and denying their petitions for a waiver of the rules.
 
 
 18
 These appeals, brought under § 402(a) and (b) of the Communications Act,[7] seek review of the original Commission Report and Order of September 13, 1961, and the Orders of November 21, 1962, reaffirming the Commission's earlier decision.
 
 
 19
 The Commission has moved that the petition in No. 17500 under section 402 (a) be dismissed. Since the issues we decide on the merits come within our jurisdiction conferred by section 402(b) of the Act, invoked in Nos. 17498 and 17499, and since this jurisdiction is mutually exclusive of that conferred by section 402(a), invoked in No. 17500, the motion to dismiss No. 17500 is granted. The City of New York Municipal Broadcasting System (WNYC) and Westinghouse Broadcasting Co., Inc., intervened in No. 17500, filed briefs and have been heard on the questions we decide. Their participation is considered that of amici curiae.
 
 
 20
 We consider now appellants' contention that the orders of the Commission effected a modification of their licenses and are therefore invalid in the absence of an adjudicatory type of proceeding. We discussed this problem rather fully in Transcontinent Television Corp. v. Federal Communications Comm'n, 113 U.S.App. D.C. 384, 308 F.2d 339 (1962), and we believe the principles of that case apply here. The amendments to the rules, made pursuant to procedures valid for rule making purposes, became effective October 30, 1961. The order for the amendments provided that action on applications for the new Class II stations would not be taken until January 30, 1962.[8] The licenses of WJR and WGN expired, respectively, October 1, 1961, and December 1, 1961. Thus, the effectiveness of the amendments insofar as any duplication on the frequencies of WJR and WGN is concerned was not to occur until after the expiration of the licenses of those stations. The fact that the decision amending the rules was made before the expiration of the licenses of WJR and WGN does not alter the situation. The operation of neither WJR nor WGN was subject to any interference or other difference during the life of the licenses of those stations prior to their renewals. The practical effect, and the legal result which we think follows, is that there actually was no modification prior to the expiration of the licenses. These remained with their original integrity for the three year terms of their existence. Nor was there any modification of the licenses after their renewals since the renewed licenses incorporated the terms of the new amendments.[9]
 
 
 21
 We think the foregoing also disposes of the contention that the principles of Transcontinent are inapplicable in that in this case the applications for renewal of the WJR and WGN licenses were filed prior to the amendments of the rules. Appellants rely on section 9 (b) of the Administrative Procedure Act,[10] which in part provides:
 
 
 22
 "In any case in which the licensee has, in accordance with agency rules, made timely and sufficient application for a renewal or a new license, no license with reference to any activity of a continuing nature shall expire until such application shall have been finally determined by the agency."
 
 
 23
 However, applications are not licenses, and we do not construe the above provision to mean that the Commission is disabled by the mere filing of a renewal application from effectuating rule changes, adopted prior to the expiration of the license, by incorporating the changes in its renewal of the license.
 
 
 24
 It is true that Transcontinent involved a rule making proceeding in which a specific proposal, namely, the reallocation of one television channel affecting only one license, was involved, whereas here the proceeding was much less specific in its objective; but we are unable to see that this difference leads to a conclusion that there was a modification of their licenses which entitled WJR and WGN to a full evidentiary hearing, in contrast to the hearing which they had. If that hearing was adequate for rule making, as seems conceded, and if the resulting amendments were not to go into effect, as was the case, until the licenses were renewed, there was no modification or denial of procedural due process within the meaning of the decision in National Broadcasting Co. v. Federal Communications Comm'n, 76 U.S.App.D.C. 238, 132 F.2d 545 (1942), affirmed, 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374 (1943).
 
 
 25
 The central contention of appellants on the merits is that the Commission failed to accomplish its purpose of insuring an equitable distribution of radio service under its statutory obligation, see 47 U.S.C. § 307(b) (1958), to make "such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service * * *", having in mind the large "blank spots" of "white areas."
 
 
 26
 We are not called upon to decide whether in its continuing responsibilities the Commission has fully achieved the purposes of the statute or of its own proceedings initiated in 1945. Our problem rather is to decide whether we must disagree with what the Commission has so far done and hold that the orders before us are inconsistent with, or defeat, those purposes.
 
 
 27
 As we have already indicated the Commission gave its reasons for its action, originally in detail, and again upon reconsideration. Its opinions are available and need not be detailed here. Competing factors arising from the record were amply considered and a rational and reasonable result reached which must stand upon this judicial review.
 
 
 28
 Conceding that an increase in power has "potential for significant additions to service which the employment of higher power on even a few stations could make possible," the Commission nevertheless concluded "that there is insufficient basis before us for a finding that the public interest would be served by authorizing higher power," taking the position that the question warranted further consideration in the light of such improvements and changes in service as may result from its authorization of additional unlimited time stations on thirteen of the Class I-A clear channels.
 
 
 29
 We should not deny the Commission the opportunity for this further consideration; for while the case for higher power is strong, it is as yet unproved to the extent that requires the court to compel the Commission to authorize it. We give regard to the reasons stated by the Commission based upon social and economic implications which the Commission considered to outweigh, in deciding the public interest, the technically improved and expanded skywave service which would result from higher power. See note 5, supra. The Commission referred also to the possible monopolistic tendencies which might result from the authorization of higher power for a few stations. This and other factors which support the Commission's judgment cannot be said by this court to be so insignificant as to require a different result at the hands of the court.[11] Accordingly, we do not disturb the Commission's decision not to amend section 3.21(a) (1) of its rules so as to allow the higher power sought by appellants.
 
 
 30
 There is also the question whether, in combination with the failure to authorize higher power, or considered alone, the amendment of the rules to authorize additional unlimited time stations on thirteen of the twenty-five Class I-A clear channel frequencies, including the frequencies assigned to WJR and WGN, should be set aside. As to the frequencies of WJR and WGN, duplication on the latter was authorized to supply a first nighttime primary or groundwave service to certain areas without such service, and duplication of WJR's frequency was authorized, as we have said, to provide a substitute frequency for station KFMB, San Diego, California, whose original frequency had been assigned to Mexico under the terms of a 1961 international agreement which precluded its further use by KFMB.
 
 
 31
 The overall result of all duplications authorized, at best, will be to bring to only an additional 600,000 people, of the 25,000,000 now without it, an acceptable primary nighttime service, with no improved service to the remainder. In all the circumstances, however, we may not say that this is a failure by the Commission to carry out its obligations under sections 307(b)[12] and 303 (f)[13] of the Act, alone or in connection with its refusal now to authorize power in excess of 50 kw. The frequency duplications authorized are for stations so located in relation to existing Class I-A stations that, with technical means now available, the latter will be protected against co-channel interference of any significance, with the gain stated in new primary service and a continuation of two existing services which are needed. At the same time a sufficient number of Class I-A channels are reserved without duplication for possible future improvement of skywave service. Assuming in the case of WGN that it could provide improved skywave service with increased power, the Commission pointed out its potential in this respect is less than that of channels reserved in status quo.
 
 
 32
 The Commission recognized the overall difficulties, placing the problem in the following light, which we think was justified:
 
 
 33
 "To bring about badly needed improvement in nighttime service various alternatives have been suggested, which resolve generally into duplication, higher power, or some combination thereof. * * * Either alternative leaves much to be desired and we have attempted through a judicious combination of the possible advantages of the two approaches to reap some of the benefits of each. Thus, through duplication we extend to as many persons as possible the benefits of a first nighttime primary service. This type of service is better and more to be desired than skywave service. We have at the same time, however, retained the status quo on a sufficient number of channels which, should economic, social, and other considerations indicate higher power is in the public interest, can bring a total of four skywave services to practically the entire United States. * * *"
 
 
 34
 After the decision reflected in the Commission's Report and Order of September 13, 1961, WJR and WGN, as we have said, filed applications for power of 750 kw, and requested waiver of the rules to permit these applications to be granted. The applications were denied by Memorandum Opinion and Order adopted November 21, 1962, and were returned. Since the Commission had determined in Docket No. 6741 that its rules should not be amended to permit power above 50 kw, and this determination had been reached under valid rule making procedures, the ruling of the Commission to the effect that no evidentiary hearing was required on these two applications of WJR and WGN, in addition to such hearing as had been available to them in the rule making proceedings, was proper. The issues had been validly disposed of in those proceedings and need not be the subject of reconsideration in the manner requested. See United States v. Storer Broadcasting Co., 351 U.S. 192, 205, 76 S.Ct. 763, 100 L.Ed. 1081 (1956).
 
 
 35
 Nos. 17498 and 17499 affirmed.
 
 
 36
 No. 17500 dismissed.
 
 
 
 Notes:
 
 
 [1]
 A standard broadcast station transmits two types of signals, a groundwave and a skywave signal. Since the former is more reliable and less variable in intensity than the latter, the service provided by the skywave signals is considered "secondary." Skywave service varies in effectiveness with changes in such factors as the time of day, weather, latitude and atmospheric noise. It is chiefly effective at night, when it can provide a useful service to a much larger area than can be reached by groundwave signals
 
 
 [2]
 WGN's use of 720 kc was to be duplicated by an unlimited time station in Utah and WJR's use of 760 kc by one to be located in Idaho
 
 
 [3]
 Clear Channel Broadcasting In the Standard Broadcast Band, 31 F.C.C. 565 (1961)
 
 
 [4]
 WJR's license expired on October 1, 1961. On October 4, 1961, it was renewed by the Commission subject to the condition that "operation under this renewal is subject to whatever interference may be caused to Station WJR, outside of its 0.5 mv/m 50% skywave contour, by a co-channel unlimited time Class II station assigned to San Diego, Calif., pursuant to the Report and Order in Docket No. 6741 adopted September 13, 1961 * * *." WGN's license expired on December 1, 1961. It was renewed on January 3, 1962, after the effective date of the Commission's Report and Order of September 13, 1961
 
 
 [5]
 The Commission referred to the social and economic problems which higher power would cause, particularized on this appeal by questioning whether (1) authorizing a few "superpower" radio stations to serve a vast area and population would be compatible with the principle that the widest possible dissemination of information from diverse and antagonistic sources of local origin is in the public interest; (2) whether it is in the public interest to allow a few stations to achieve the competitive pre-eminence that would come with their use of higher power
 
 
 [6]
 24 P. & F. Radio Reg. 1595 (1962)
 
 
 [7]
 48 Stat. 1093 (1934), as amended 47 U.S.C. § 402(a), (b) (1958)
 
 
 [8]
 Subsequently, in its Memorandum Opinion and Order denying appellants' Petitions for Reconsideration the Commission declared that no final action on the applications would be taken until July 2, 1963 in order that Congress would have time to enact legislation on the clear channel matter, if it so desired
 
 
 [9]
 See note 4,supra.
 
 
 [10]
 60 Stat. 242 (1946), 5 U.S.C. § 1008 (b) (1958)
 
 
 [11]
 In its Report and Order of September 13, 1961, the Commission made reference to a Senate Resolution (S.Res. 294, 75th Cong., 3d Sess. (1938)) stating that the use of power in excess of 50 kw was "definitely against the public interest." On July 2, 1962, the House of Representatives adopted a Resolution (H.R. Res. 714, 87th Cong., 2d Sess.) expressing the sense of the House that, notwithstanding the earlier Senate Resolution, the Commission was free to authorize the use of higher power on any of the Class I-A clear channels if it found this to be in the public interest. The Resolution also expressed the sense of the House that the Commission should not authorize any additional fulltime stations on a Class I-A frequency for a year so that the Commission could give further consideration to the matter. The appellants contend that the Commission, in deciding against the present authorization of higher power erred in affording "due recognition" to the 1938 Senate Resolution in the face of the later and confliction House Resolution. However, in its later Memorandum Opinion and Order denying appellants' Petitions for Reconsideration, the Commission stated that its reference to the Senate Resolution "was merely intended as a recitation of historical fact" and that its decision on the higher power question rested "on grounds wholly independent of the 1938 Senate Resolution." The Commission went on to say that although the House Resolution was not legally binding upon it, it would accord due consideration to the sense of the House, as expressed in that Resolution, and would refrain from authorizing additional fulltime stations on Class I-A frequencies until July 2, 1963
 
 
 [12]
 48 Stat. 1084 (1934), as amended, 47 U.S.C. § 307(b) (1958)
 
 
 [13]
 48 Stat. 1082 (1934), as amended, 47 U.S.C. § 303(f) (1958)