PASADENA BROADCASTING
COMPANY, Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Western Broadcasting Corporation and
Voice in Pasadena, Inc., Intervenors.

GOODSON–TODMAN BROADCASTING,
INC., Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Western Broadcasting Corporation and
Voice in Pasadena, Inc., Intervenors.

Charles W. JOBBINS, Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Western Broadcasting Corporation and
Voice in Pasadena, Inc., Intervenors.

VOICE IN PASADENA, INC., Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Western Broadcasting Corporation,
Intervenor.

PACIFIC FINE MUSIC, INC., Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Western Broadcasting Corporation and
Voice in Pasadena, Inc., Intervenors.

ORANGE RADIO, INC., Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Western Broadcasting Corporation,
Intervenor.

Nos. 74–1002, 74–1012, 74–1019, 74–1033,
74–1034 and 74–1454.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 5, 1975.

Decided May 12, 1977.

Reed Miller, Washington, D. C., for appellant in No. 74–1012.

James A. Gammon, Washington, D. C., with whom John M. Duty, Washington, D. C., was on the brief, for appellant in No. 74–1019.

Gerald S. Rourke, Washington, D. C., with whom Edward P. Morgan, Washington, D. C., was on the brief, for appellant in No. 74–1454.

Gregory M. Christopher, Counsel, F. C. C., Washington, D. C., with whom Ashton R. Hardy, Gen. Counsel, and Joseph A. Marino, Associate Gen. Counsel, F. C. C., Washington, D. C., were on the brief, for appellee. John W. Pettit, Gen. Counsel, Washington, D. C., at the time the record was filed, Philip V. Permut and Joseph Volpe, III, Counsel, F. C. C., Washington, D. C., also entered appearances for appellee.

Thomas H. Wall, L. Adrian Roberts and John H. Marple, Washington, D. C., were on the brief for appellant in No. 74–1002.

Frank U. Fletcher and Edward F. Kenehan, Washington, D. C., were on the brief for appellant in No. 74–1034.

Joseph M. Kittner, Washington, D. C., with whom James A. McKenna, Jr., Thomas N. Frohock and Steven A. Lerman, Washington, D. C., were on the brief, for intervenor Western Broadcasting Corporation.

Joseph F. Hennessey, Lee G. Lovett and Robert M. Booth, Jr., Washington, D. C., entered appearances for appellant in No. 74–1033 and for intervenor Voice in Pasadena.

Before ROBINSON and MacKINNON, Circuit Judges, and ROBERT H. MERHIGE, Jr.,[*] United States District Judge for the Eastern District of Virginia.

Opinion for the Court filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

In March, 1962, the Federal Communications Commission disqualified its licensee broadcasting from Pasadena, California, on the 1110 kHz (AM) frequency.[1] Interim authorization was issued lest the channel fall silent,[2] and the Commission invited applications from would-be successors to the frequency. The ensuing proceeding generated no fewer than eight opinions during its twelve-year administrative lifespan.[3] The hearing examiner, the Review Board and the Commission each favored a different applicant, and for different reasons. Although each struggled valiantly with the bevy of complex issues presented, the net result was error, and so we reverse.

I

Of those responding to the Commission's call for applications, seven are parties to these appeals. Four of these proposed service from facilities in Pasadena,[4] and one each from Whittier,[5] Fullerton[6] and the Costa Mesa-Newport area.[7] Pasadena borders on Los Angeles; the other communities lie roughly on a line from Pasadena south-southeasterly to Newport, which is about twenty miles from the Los Angeles

[*] Sitting by designation pursuant to 28 U.S.C. § 292(d) (1970).

1. Eleven Ten Broadcasting Co., 32 F.C.C. 706, reconsideration denied, 33 F.C.C. 92, aff'd sub nom. Immaculate Conception Church v. FCC, 116 U.S.App.D.C. 73, 320 F.2d 795, cert. denied, 375 U.S. 904, 84 S.Ct. 196, 11 L.Ed.2d 145 (1963).

2. Oak Knoll Broadcasting Corp., 45 F.C.C. 1571 (1964).

3. Charles W. Jobbins, 29 F.C.C.2d 609 (examiner's decision 1969) hereinafter cited "Initial Decision"; Charles W. Jobbins, 29 F.C.C.2d 533 (Rev.Bd.1971) hereinafter cited "Review Board Decision"; Charles W. Jobbins, 29 F.C.C.2d 849 (Rev.Bd.1971); Charles W. Jobbins, 33 F.C.

C.2d 821 (1972); Charles W. Jobbins, 39 F.C. C.2d 595 (1973); Goodson-Todman Broadcasting, Inc., 45 F.C.C.2d 573 (1973) hereinafter cited "Final Decision", reconsideration denied, 46 F.C.C.2d 533 and 49 F.C.C.2d 242 (1974).

4. Appellants Pasadena Broadcasting Company; Voice in Pasadena, Inc.; Goodson-Todman Broadcasting, Inc.; and intervenor Western Broadcasting Company—the Commission's choice.

5. Appellant Pacific Fine Music, Inc.

6. Appellant Orange Radio, Inc.

7. Appellant Charles W. Jobbins.

city limits and about forty miles from Pasadena. The Newport applicant proposed one-kilowatt daytime service only while the rest—the "high-power" applicants—contemplated operation on the same basis as the prior licensee: 50 kilowatts daytime and 10 kilowatts nighttime, unlimited service.[8]

No useful purpose would be served by blueprinting every aspect of the Commission's architectonics. The keystone of the decisional edifice it constructed is the collective view of Section 307(b) of the Communications Act, which provides:

> (b) In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same.[9]

The Commission's Review Board disqualified the Newport applicant because his proposal would have provided daytime service to only about three million people,[10] whereas all of the high-power proposals would have reached over five million people day and night.[11] Thus the Newport submission was deemed to run afoul of the "efficiency" mandate of the section,[12] which at each level of the administrative process was read as a direction to allot the frequency "so as to provide service to the greatest population and area possible"[13] after such matters as interference had been taken into account.[14] That Newport had at that time no AM transmission facility—a factor heavily to be weighed in Section 307(b) decisions[15]—gave it no advantage in the Review Board's eyes, for the same was true of the other communities represented in the proceeding.[16] Thus considerations of fairness and equity

8.  *Review Board Decision, supra* note 3, 29 F.C. C.2d at 534.

9.  47 U.S.C. § 307(b) (1970).

10.  *Initial Decision, supra* note 3, 29 F.C.C.2d at 663.

11.  Compare *id.* at 665–675 with *Final Decision, supra* note 3, 45 F.C.C.2d at 593 n.5.

12.  The Review Board, which the Commission sustained, noted two other defects in the Newport application but, in view of the treatment accorded to high-power applicants who shared these deficiencies, we cannot presume that the Commission regarded them as dispositive. One indisputably legitimate concern of the Commission was protecting the international allocation of the frequency to the United States by virtue of the penetration of the Mexican border by the prior licensee's signal. See *Review Board Decision, supra* note 3, 29 F.C.C.2d at 540–541. The Newport proposal, specifying daytime service only, could only partially conserve this advantage to the United States. *Id.* at 543. Yet another applicant whose signal penetrated the border neither by night nor by day was assessed only a "slight demerit" therefor. *Final Decision, supra* note 3, 45 F.C.C.2d at 594.

A second defect in the Newport proposal was uncovered when the Hearing Examiner found that it unacceptably overlapped the contours of a preexisting San Diego station. *Initial Decision, supra* note 3, 29 F.C.C.2d at 760. The Review Board, taking official notice of an intervening change in the San Diego station's operations, discounted the importance of the overlap, *Review Board Decision, supra* note 3, 29 F.C.C.2d at 543 n.16, which led it to assume that the Newport application comported with engineering standards. *Id.* Though, with respect to other candidates, the Commission's final decision rejected this apparently unobjectionable reference to matters of public record, *Final Decision, supra* note 3, 45 F.C.C.2d at 591, it attributed but "minor significance" to the other, albeit less egregious, instances of the now-hypothetical overlap. *Id.* at 594. We are loathe, therefore, to speculate on what the Commission's posture would be once its § 307(b) error with respect to Newport was brought to light. Additionally, since these proceedings must in any event be remanded to the Commission for a fresh look, we find it unnecessary to pass upon its refusal to take official notice of this and other matters. No rationale now appears for deciding these already hoary cases on obviously outmoded factual findings.

13.  See, *e. g., Final Decision, supra* note 3, 45 F.C.C.2d at 593 n.36, quoting *Grand Haven Broadcasting Co.,* 14 F.C.C. 1351, 1366 (1950); *Review Board Decision, supra* note 3, 29 F.C. C.2d at 540 *et passim; Initial Decision, supra* note 3, 29 F.C.C.2d at 764–766.

14.  E. g., *Final Decision, supra* note 3, 45 F.C. C.2d at 593. Cf. *Review Board Decision, supra* note 3, 29 F.C.C.2d at 542–543.

15.  See note 38 *infra* and accompanying text.

16.  *Review Board Decision, supra* note 3, 29 F.C.C.2d at 544. Indeed, in reaching its decision in favor of the Fullerton applicant, the Review Board relied upon that city's lack of a nighttime aural transmission facility. *Id.* at 549.

in the allocation of the spectrum were not brought into play, and the greater efficiency of the high-power proposals led the Review Board to prefer all of them to the Newport aspirant.

Had matters ended there, our task would have differed significantly. As it was, the Commission sustained the Review Board's denial as to Newport without further ado.[17] but went on to request argument solely from the high-power candidates addressed to the theory on which the Review Board had chosen among them.[18] In the Commission's hands, all the high-power plans became designs for transmission service for the entire Los Angeles-Long Beach metropolitan area rather than for any one community therein.[19] Once that transformation eliminated the necessity of choosing among Fullerton, Pasadena and Whittier on the basis of need for additional service, the Commission, like the Review Board, found dispositive the question of greatest efficiency of the applicants' proposals [20] and, again like the Review Board, did not resort to standard comparative issues in reaching its decision. The upshot is that the Commission awarded the 1110 kHz frequency to Los Angeles, which it found to be served by over a score of AM stations, twelve of which specify Los Angeles as the city of license,[21] over Newport, to which no AM transmission service is specifically dedicated.[22]

## II

In support of this disposition, the Commission considered only the larger population to be served by the "Los Angeles" applications than by that for Newport.[23] A finding on that score is, however, merely tangential to the congressional imperative to assure "fair, efficient, and equitable" distribution of the broadcast band "among the several States and communities." [24] Congress was, of course, concerned that radio service extend to as large an audience as possible,[25] but that is not to say that the license is to be awarded to the applicant who would encompass the most listeners within the range of his signal.[26] If that

---

**17.** *Charles W. Jobbins, supra* note 3, 39 F.C. C.2d at 598.

**18.** *Id.*

**19.** See *Final Decision, supra* note 3, 45 F.C. C.2d at 579–580:

> [W]e conclude that no Section 307(b) choice may be made under the unique circumstances of this case among the communities of Pasadena, Fullerton, and Whittier. . . .
>
> We agree with the [administrative law judge's] . . . characterization of the facility under consideration as a "metropolitan area" service rather than one for a specified community. . . . [T]he mere fact that a studio may be located in one community rather than another is not entitled to dispositive consideration.

(footnote omitted).

> We are asked to reverse this determination as contrary to the Commission's *Policy Statement on Section 307(b) Considerations for Standard Broadcast Facilities Involving Suburban Communities,* 2 F.C.C.2d 190 (1965). In view of our disposition of these appeals, we do not pass on the propriety of treating these communities as a homogeneous part of Los Angeles, nor on the Commission's curious distinction between that and the situations contemplated by the Policy Statement. *Final Decision, supra* note 3, 45 F.C.C.2d at 578–580.

**20.** *Id.*, 45 F.C.C.2d at 593 & n.36.

**21.** See *Initial Decision, supra* note 3, 29 F.C. C.2d at 732–733.

**22.** See text accompanying note 16 *supra.*

**23.** See, *e. g., Review Board Decision, supra* note 3, 29 F.C.C.2d at 541–546. But. *cf.* note 12 *supra.*

**24.** See text *supra* at note 9.

**25.** That may in fact be seen as the Commission's *raison d'etre.* See 47 U.S.C. § 151 (1970).

**26.** See *Television Corp. of Michigan, Inc. v. FCC,* 111 U.S.App.D.C. 101, 103, 294 F.2d 730, 732 (1961) (disapproving the Commission's "premise that more service to more people— even to a group already well served—is prima facie desirable"); *Easton Publishing Co. v. FCC,* 85 U.S.App.D.C. 33, 38, 175 F.2d 344, 349 (1949) ("difference in size does not necessarily spell a difference in need"). *Cf. Northeast Broadcasting, Inc. v. FCC,* 130 U.S.App.D.C. 278, 289, 400 F.2d 749, 760 (1968) (concurring opinion).

were so, all frequencies likely would be assigned sooner or later to powerful stations in major population centers—precisely the result Congress meant to forestall by means of Section 307(b) as even cursory examination of its ancestry indicates.

Concentration of radio service in the big city was a problem at the time Section 307(b) was first enacted as part of the Radio Act of 1927,[27] and its purpose was to enjoin "an equitable distribution of stations over the entire country."[28] Many feared that the standard was too protean, however,[29] and that apprehension was fanned by the omission from the bill emerging from conference of the requirement in the Senate and House bills of "due consideration of the right of each state to have allocated to it or to some [entity] within it, the use of a wave length. . . . ."[30] Vigorous efforts to reinsert that language failed,[31] but the next year brought an amendment specifying that the Commission allocate broadcasting service formulaically according to population to each state and among five "zones" into which the Nation was divided.[32]

Unfortunately, the mechanical formula thereby imposed resulted in "the concentra-tion of the use of frequencies in centers of population, and the restriction of facilities in sparsely populated states, even though interference consideration [sic] would permit the operation of one or more additional stations."[33] At the Commission's behest, therefore, Section 307(b) was substantially restored to its original form—in which it remains.[34] The purpose of this reversion was twofold: to loose the Commission from the fetters imposed by the quota system, and to allow "sparsely populated" areas, especially in the West and Middle West, to "secur[e] the facilities we ought to have to meet the demands of that section of the country."[35]

Section 307(b)'s emphasis on wide dispersion of radio transmission service gave rise long ago to the rule that "when mutually exclusive applicants seek authority to serve different communities, the Commission first determines which community has the greater need for additional services and then determine[s] which applicant can best serve that community's need."[36] Local transmission service bestows such important benefits[37] that we have consistently interpreted Section 307(b) virtually to ensure an applicant for first local service preference over one who proposes merely to complement

27. Pub.L. No. 69–632, ch. 169, § 9, 44 Stat. 1166.

28. 67 Cong.Rec. 5479 (1926). See 67 Cong.Rec. 5564 (1926) (remarks of Representative Davis).

29. 67 Cong.Rec. 12355 (1926) (remarks of Senator Cummins).

30. 68 Cong.Rec. 2557 (1927).

31. See 68 Cong.Rec. 2568–2575, 3031–3033, 3120, 3123, 3258–3259 (1927).

32. Act of Mar. 28, 1928, Pub.L. No. 70–195, 45 Stat. 373. See, *e. g., General Elec. Co. v. Federal Radio Comm'n*, 58 App.D.C. 386, 387–388, 31 F.2d 630, 632–633 (1929), *cert. dismissed*, 281 U.S. 464, 470, 50 S.Ct. 389, 391, 74 L.Ed. 969, 972 (1930). *Cf. Federal Radio Comm'n v. Nelson Bros. Bond & Mortgage Co.*, 289 U.S. 266, 278–281, 53 S.Ct. 627, 633–634, 77 L.Ed. 1166, 1174–1176 (1933); *WHB Broadcasting Co. v. Federal Radio Comm'n*, 61 App.D.C. 14, 15, 56 F.2d 311, 312 (1932). See Note, 21 Va.L.Rev. 318, 322 (1935).

33. Letter on S.2243 from Chairman of FCC, 80 Cong.Rec. 6032 (1936); H.R.Rep. No. 2589, 74th Cong., 2d Sess. 3 (1936); S.Rep. No. 1588, 74th Cong., 2d Sess. 3 (1936).

34. Act of June 5, 1936, ch. 511, Pub.L. No. 74–652, 49 Stat. 1475, codified as 47 U.S.C. § 307(b) (1970).

35. 80 Cong.Rec. 6032 (1936). See H.R.Rep. No. 2589, *supra* note 33, at 3; S.Rep. No. 1588, *supra* note 33, at 3.

36. *FCC v. Allentown Broadcasting Co.*, 349 U.S. 358, 361, 75 S.Ct. 855, 858, 99 L.Ed. 1147, 1153 (1955).

37. *Jackson Broadcasting & Television Corp. v. FCC*, 108 U.S.App.D.C. 128, 129 n.3, 280 F.2d 676, 677 n.3 (1960). *Cf. Jupiter Assoc., Inc. v. FCC*, 136 U.S.App.D.C. 266, 272, 420 F.2d 108, 114 (1969); *Pinellas Broadcasting Co. v. FCC*, 97 U.S.App.D.C. 236, 239, 230 F.2d 204, 207, *cert. denied*, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956).

preexisting local operations.[38] In the wake of this body of precedent, the Commission makes no showing that it did compare Los Angeles' need for still another AM station with Newport's need for its first; nor does it satisfactorily distinguish its action here from that on previous occasions in finding fairness and equity to substantially favor first local service.[39] These omissions render its order infirm.

## III

One other matter deserves mention. The Commission found the engineering and siting specifications of every high-power "Los Angeles area" submission "deficient in some respect,"[40] chiefly because each proposed operation would produce objectionable interference with the signals of one or more other radio stations.[41] The absence of a technically-qualified applicant motivated the Commission to an exhaustive consideration of which plan permitted the "most efficient use of the 1110 kHz frequency in the southern California area"[42]—shorthand for saying that the most auditors should, in the aggregate, be served.[43] At the same time, the Commission totally disregarded the standard comparative issues that purport to test for the applicant that most closely conforms with the desired industry structure and the proposal that would deliver the best practicable service.[44] Surprised

---

**38.** See, e. g., *Fort Harrison Telecasting Corp. v. FCC*, 116 U.S.App.D.C. 347, 350, 324 F.2d 379, 382 (1963), *cert. denied*, 376 U.S. 915, 84 S.Ct. 665, 11 L.Ed.2d 611 (1964); *The Price Broadcasters, Inc. v. FCC*, 295 F.2d 166, 168–169, 111 U.S.App.D.C. 179, 181–182 (1961); *Interstate Broadcasting Co. v. FCC*, 105 U.S.App.D.C. 224, 228–229, 265 F.2d 598, 602–603 (1959); *Easton Publishing Co. v. FCC, supra* note 26, 85 U.S.App.D.C. at 35, 175 F.2d at 346. *Cf. Fidelity Television, Inc. v. FCC*, 169 U.S.App. D.C. 225, 235, 515 F.2d 684, 694, *cert. denied*, 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975); *Northeast Broadcasting, Inc. v. FCC, supra* note 26, 130 U.S.App.D.C. at 284, 400 F.2d at 755. See generally, *Anthony, Towards Simplicity and Rationality in Comparative Broadcast Licensing Proceedings*, 24 Stan.L. Rev. 1, 85–87 (1970); *Comment, Comparing the Incomparable: Towards a Structural Model for FCC Comparative Broadcast License Renewal Hearings*, 43 U.Chi.L.Rev. 573, 600–601 (1976).

**39.** See authorities cited *supra* at note 38. The Commission asserts that preexisting broadcast stations can be maintained even though their continuance does not satisfy the strictures of § 307(b). See, e. g., *Final Decision, supra* note 3, 45 F.C.C.2d at 577–578; *Review Board Decision, supra* note 3, 29 F.C.C.2d at 538–539. This contention is, we think, belied by the face of the statute, which applies not only to changes in the structure of spectrum allocation, such as grants of new licenses or modifications, but to license renewals as well. *Cf. e. g., Fidelity Television, Inc. v. FCC, supra* note 38, 169 U.S.App.D.C. at 235, 515 F.2d at 694. Our inference is buttressed by the section's adjuration that the Commission consider the propriety of allocation "when and insofar as there is demand" for service. 47 U.S.C. § 307(b) (1970). Satisfaction of these statutory commands is not, nor ought it to be, a one-time

thing, for the balance of demand for service will shift among communities over time. Admittedly these cases are distinguishable from those in which we have held that "where cities are competing for channel allocation, a temporary allocation to one city rather than another should not operate to create vested rights." *Fort Harrison Telecasting Corp. v. FCC, supra* note 38, 116 U.S.App.D.C. at 354, 324 F.2d at 386. See *Beloit Broadcasters, Inc. v. FCC*, 125 U.S.App.D.C. 29, 30–31, 365 F.2d 962, 963–964 (1966). *Cf. Community Broadcasting Co. v. FCC*, 107 U.S.App.D.C. 95, 101, 274 F.2d 753, 759 (1960). It is clear, moreover, that the Commission should not be required to compromise its considered judgment as to what distribution is proper every time someone is dissatisfied with existing allocations. *Cf. Logansport Broadcasting Corp. v. United States*, 93 U.S. App.D.C. 342, 345–346, 210 F.2d 24, 27–28 (1954). On the other hand, the Commission is required to reasonably respond to changing conditions and here, at least, where the Commission had designated the § 307(b) issue, see *Initial Decision, supra* note 3, 29 F.C.C.2d at 612–614, it may not cleave to the status quo without a legally acceptable justification.

**40.** *Final Decision, supra* note 3, 45 F.C.C.2d at 581.

**41.** See, e. g., *id.* at 582–593.

**42.** *Id.* at 595.

**43.** See *id.* at 593 & nn. 35–36.

**44.** *Policy Statement on Comparative Broadcast Hearings*, 1 F.C.C.2d 393, 394–398 (1965). See, e. g., *Star Television, Inc. v. FCC*, 135 U.S.App. D.C. 71, 74, 416 F.2d 1086, 1089, *cert. denied*, 396 U.S. 888, 90 S.Ct. 171, 24 L.Ed.2d 163 (1969); *Anthony, supra* note 38, 24 Stan.L.Rev.

by this apparent departure from long-settled precedent,[45] we requested that the Commission further elucidate its elision of the comparative issues.[46]

The Commission's response taxes us with an "apparent misunderstanding" that its focus on technical questions is traceable to Section 307(b)'s "efficiency" criterion.[47] It at once concedes that efficiency in this sense "may be considered as a comparative issue,"[48] and postulates that "where 'efficiency' considerations under 307(b) are dispositive, comparative issues need not be reached."[49] To hold otherwise, the Commission continues, "would be to suggest that even in the case of flagrantly inefficient proposals and marked violations of our technical standards, a full comparative hearing would be mandated . . . ."[50] Finally, it suggests that whatever may obtain in the usual case, the disparity here between the victor's technical presentation and those of the vanquished is so vast that we should proceed as if there were only one qualified candidate.[51]

Underlying the agency's *apologia* is the premise that Section 307(b), with its requirement of "fair, efficient, and equitable" spectrum allocation,[52] is a talisman whereby the rigors of a comparative hearing may be avoided if only grounds for decision can be found that smack of "efficiency"—or, presumably, "fairness" or "equity." We reject such a notion. To be sure, courts have countenanced rules dispensing with full-dress hearings on proposals that are, in the expert eyes of the Commission, dramatically wasteful or inequitable.[53] One of many is the Section 307(b) policy, sustained in *FCC v. Allentown Broadcasting Company*,[54] of allocating transmission service among communities without reference to the relative qualities of their respective champions, lest "the needs of the community" be "sub-

---

at 27–33. *Cf. Fidelity Television, Inc. v. FCC, supra* note 38, 169 U.S.App.D.C. at 240, 515 F.2d at 710 (Bazelon, C. J., dissenting from denial of rehearing *en banc*); *Citizens Communications Center v. FCC,* 145 U.S.App.D.C. 32, 43–45, 447 F.2d 1201, 1212–1214 (1971), *clarified,* 149 U.S.App.D.C. 419, 463 F.2d 822 (1972).

**45.** See, *e. g., Policy Statement on Comparative Broadcast Hearings, supra* note 44, 1 F.C.C.2d at 398 & n.12; *Ashbacker Radio Corp. v. FCC,* 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945); *Citizens Communications Center v. FCC, supra* note 44; *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971); *Johnston Broadcasting Co. v. FCC,* 85 U.S.App.D.C. 40, 175 F.2d 351 (1949).

**46.** We remanded for clarification on two issues:
(1) Did the Commission consider any standard comparative issues, other than the efficiency factor, in reaching its decision?
(2) If not, why did the Commission deem it unnecessary to reach those issues, and how does the Commission's decision avoid inconsistency with the authorities noted above? *Pasadena Broadcasting Co. v. FCC,* No. 74–1002, at 2 (memorandum and order, D.C. Cir. Sept. 25, 1975) (unreported).

**47.** See *Goodson-Todman Broadcasting, Inc.,* 35 R.R.2d 1219, 1220 (1975), hereinafter cited *"Supplemental Report."*

**48.** *Id.* at 1225, citing and distinguishing *Policy Statement on Comparative Broadcast Hearings, supra* note 44, 1 F.C.C.2d at 398 & n.12 ("[i]n comparative cases where one of two or more competing applicants . . . would be more efficient, this fact . . . should be considered," but this factor is "not to be confused with" the choice of communities aspect of § 307(b). See, *e. g., Resort Broadcasting Co., Inc.,* 41 F.C.C.2d 640 (Rev.Bd.1973), *aff'd, Resort Broadcasting Co. v. FCC,* 167 U.S.App. D.C. 210, 511 F.2d 448 (1975).

**49.** *Supplemental Report, supra* note 47, 35 R.R.2d at 1225.

**50.** *Id.,* 35 R.R.2d at 1223.

**51.** *Id.,* 35 R.R.2d at 1225.

**52.** 47 U.S.C. § 307(b) (1970), set out in text *supra* at note 9.

**53.** See, *e. g., United States v. Storer Broadcasting Co.,* 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1955); *560 Broadcast Corp. v. FCC,* 135 U.S.App.D.C. 330, 418 F.2d 1166 (1969); *Goodwill Stations, Inc. v. FCC,* 117 U.S.App.D.C. 64, 325 F.2d 637 (1963); *Logansport Broadcasting Corp. v. FCC, supra* note 39.

**54.** *Supra* note 36.

ordinated to the ability of an applicant for another locality." [55] But we do not think that an aspirant within the scope of the rules established by the Commission may, ad hoc, be refused a comparative hearing merely because a rival appears who is somewhat more "efficient." After all, his other attributes might show that the satisfaction accorded to those who will listen counterbalances, as far as the public interest is concerned, the fact that fewer could hear.

In the case at bar, of course, there is no surfeit of qualified candidates for the 1110 kHz frequency. Nor do we face a situation like those in which unwaived violations of the Commission's rules narrow the field to but one qualified contestant.[56] All were in violation, and so presumptively their applications were not efficient nor otherwise in the public interest; the Commission felt called upon to decide to whom, if anyone, a waiver was to be granted. We find ourselves at a loss to understand why the Commission should have disdained guidance from the other applicant characteristics normally explored in comparative proceedings. Should the Commission be forced to a similar decision on remand, it will be well advised to seek enlightenment from that quarter.

*Reversed and remanded.*

---

**55.** 349 U.S. at 361–362, 75 S.Ct. at 858, 99 L.Ed. at 1153.

**56.** *E. g., Guinan v. FCC,* 111 U.S.App.D.C. 371, 297 F.2d 782 (1961); *Simmons v. FCC,* 79 U.S. App.D.C. 264, 145 F.2d 578 (1944). *Cf. Jupiter Assoc., Inc. v. FCC, supra* note 37.