**NORTHEAST BROADCASTING, INC.,**
Appellant,

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Naugatuck Valley Service, Inc.,
Intervenor.

**No. 21419.**

United States Court of Appeals
District of Columbia Circuit.

Argued April 23, 1968.

Decided July 19, 1968.

---

* See, also, order of this court filed April 12, 1968, in Rogers v. United States of America, 130 U.S.App.D.C. ——, 401 F.2d 387.

Mr. James A. Gammon, Washington, D. C., with whom Miss Lorie M. Molnar, Washington, D. C., was on the brief, for appellant.

Mr. Edward J. Kuhlmann, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, John H. Conlin, Associate General Counsel, and Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, were on the brief, for appellee.

Mr. Vernon L. Wilkinson, Washington, D. C., whom Mr. James A. McKenna, Jr., Washington, D. C., was on the brief, for intervenor.

Before WILBUR K. MILLER, Senior Circuit Judge, and McGOWAN and TAMM, Circuit Judges.

TAMM, Circuit Judge:

We are asked by appellant in this proceeding to set aside a Memorandum, Opinion and Order of the Federal Communications Commission released on October 16, 1967 (FCC 67–1126). That Opinion and Order finalized as Commission action a Decision of the Commission Review Board released July 7, 1967 (FCC 67R–280) and consequently appellant's challenge penetrates the Commission's Order and seeks to set aside the Review Board Decision.

I

Naugatuck Valley Service, Inc., operator of radio station WOWW at Naugatuck, Connecticut, filed an application with the Commission seeking authority to change its facilities from operation as a Class II station on 860 kHz with 250 watts power, daytime only, directionalized, to operation as a Class III–B station on 1380 kHz with 5 kilowatts power daytime, and 500 watts power nighttime, employing different directional antennas day and night. The application was designated for hearing by Order released October 16, 1964 (FCC 64–937) on issues addressed to inquiry into areas and populations gaining services, the availability of primary service to such areas and populations, interference issues with respect to other radio stations, an issue regarding the proposed directional antenna parameters and, of course, the ultimate public interest issue. On December 27, 1965, the Hearing Examiner released an Initial Decision (FCC 65D–61) proposing that the requested authority to change facilities be granted. This approach was in accord with the Broadcast Bureau's recommendations and was in essence that the proposed change in facilities would result in a first local nighttime transmission facility for 19,511 persons residing in Naugatuck and it also would furnish during nighttime hours a first or second primary service to a substantial number of persons.

On the same date, however, id est, on December 27, 1965, the Commission released a *Policy Statement on Section 307 (b) Considerations for Standard Broadcast Facilities Involving Suburban Communities,* 2 F.C.C.2d 190 (1965). This *Policy Statement* apparently was the result, at least in part, of our opinion in Miners Broadcasting Service, Inc. v. FCC, 121 U.S.App.D.C. 222, 349 F.2d 199 (1965). It will be recalled that in the *Miners* case we remanded the proceeding to the Commission for reconsideration or explanation of the factors considered determinative in distinguishing between two suburban applicants for radio licenses, both of whom proposed to serve some parts of their central city, in order to determine whether the applicants actually intended to serve the needs and desires of the central city rather than the suburb.

The Commission's *Policy Statement* in essence pointed out that as power and coverage are increased to serve larger numbers of persons, stations in metropolitan areas often tend to identify themselves with the entire metropolitan area rather than with the particular needs of their specified communities. The Commission concluded that where an applicant proposed a 5 mv/m daytime contour which would penetrate the geographic boundaries of any community with a population of over 50,000 persons and with at least twice the population of the applicant's specified community, a presumption will arise that the applicant proposes to serve the larger community rather than his specified location. The Commission established this presumption as a rebuttable one reasoning that many communities which adjoin a larger city might well deserve and consequently should be afforded an opportunity to have a local transmission service. In defining the new policy the Commission stated it was intended "to provide an accommodation of heretofore apparently conflicting allocation considerations. While we still wish to discourage any

proposal that will be merely a substandard central city station, we are persuaded that many developing and deserving suburban communities should be afforded an opportunity to obtain a first local transmission service. Moreover, while we wish to encourage each applicant to propose as much power as he will need to comply with our allocation rules, every applicant who falls within our test will be required to demonstrate that his proposal is designed to provide a realistic local transmission service for his specified community." 2 F.C.C.2d 190, at 193 (1965).

As a result of the Commission's *Policy Statement,* the Review Board, sua sponte, remanded this proceeding to the Examiner and remanded other pending applications for further consideration. The purpose of the remand to the Examiner was in this case to allow Naugatuck Valley Service, Inc. an opportunity to rebut the presumption that its proposal was in fact one to serve Waterbury, Connecticut, such presumption arising because the population of Naugatuck is 19,511 as compared to the Waterbury population of 107,130 people. It is to be noted also that Naugatuck is geographically contiguous to Waterbury. The Review Board in remanding to the Examiner for further consideration noted that Naugatuck Valley Service, Inc. through its proposed operation of WOWW on the 5 mv/m daytime contour would completely cover the city of Waterbury. The Board further found that the "WOWW proposal is presumptively one to serve Waterbury rather than Naugatuck" and directed in some detail that the Examiner afford WOWW an opportunity to rebut this presumption (J.A. at 17). The remanded proceeding was specifically addressed to a determination of whether the proposed expansion of WOWW facilities and periods of operation "will realistically provide a local transmission facility for its specified station location or for another larger community, in light of all of the relevant evidence * * *" (J.A. at 17).

On February 28, 1966, our appellant, Northeast Broadcasting, Inc., licensee of standard broadcast station WWCO, Waterbury, Connecticut, filed a petition to intervene before the Commission in this proceeding and the intervention petition was certified to the Examiner for action but such intervention was restricted to the new issues raised by the Review Board's remand to the Examiner. Thereafter in accord with usual procedures the Examiner heard additional witnesses and received additional documentary evidence in proceedings in which both the Broadcast Bureau and Northeast Broadcasting, Inc. participated. The Examiner rendered a Supplemental Initial Decision on November 25, 1966 (FCC 66D–67) proposing again to grant intervenor's request for revision of facilities and change in broadcasting schedules. Exceptions and supporting briefs were filed to the Supplemental Initial Decision both by appellant Northeast Broadcasting, Inc. and by the Broadcast Bureau and, of course, intervenor, Naugatuck Valley Service filed a statement in support of the Supplemental Initial Decision.

The Review Board again considered the entire case and by a decision adopted June 28, 1967 (FCC 67R–280) and released on July 7, 1967, that board again approved the grant of the requested facilities and schedule changes sought by intervenor on behalf of station WOWW. One member of the Review Board dissented from this decision. Our appellant petitioned the Commission for review of the Review Board's decision and the Commission denied this review by its Memorandum, Opinion and Order of October 16, 1967 (FCC 67–1126).

II

Appellant's challenge to the Commission's action presents a fourfold attack thereupon by urging reversible error on the Commission's part in (a) acting in an arbitrary and capricious manner in granting the WOWW application; (b) in failing in granting the application to conform to applicable Commission policy

and law; (c) in failing to set forth the basis for its actions, and (d) in taking affirmative action in granting the application without substantial evidence of record to support that action. There is, however, such substantial overlapping of discussion and argument in Appellant's Brief as to these issues and the "Statement of Points" (appearing therein at pages seven and eight) as to make a seriatim treatment in this opinion of argument and response a virtual impossibility. We must therefore consider each argument for reversal of the Commission's action on the basis of its content rather than upon the order of its enumeration or the sometimes confusing phraseology of its presentation. We are not aided in our consideration of the problems arising in this case by the failure of Commission counsel to comment upon, distinguish between, or differentiate several cases cited by appellants.[1]

We do not accept appellant's contention that the Review Board disregarded our "prior directions" in Miners Broadcasting Service, Inc. v. FCC, *supra*. Our opinion in that case was addressed basically to a difficulty growing out of a record which did not make "clear to us that the facts of this case compel a distinction between appellant and intervenor."[2] Our remand to the Commission was specifically to require articulation of the "relevance of the difference" between the relative city coverage of the competing applicants and to "make additional findings of fact in support of its determination."[3] The mandate to the Commission, if such there was, related to the facts and record in the Miners case. Obviously the court is without authority, and we hope without willingness or desire, to demand policy formulation or statement upon the part of this Commission or any other administrative agency. Our concern and responsibility is confined to the application and operation of the law as it relates to the legal problems arising in individual cases as they are properly brought before us. Perhaps the expression of our concern in the Miners case was a factor in the Commission's *Suburban Policy Statement* of December 27, 1965, but whether this is so has no relevance whatsoever to the authority of the Commission under 47 U.S.C. § 307(b) (1964)[4] to study and formulate a defined policy as a guide to license applicants and to its own staff in the processing of applications within this category. The resulting *Policy Statement* and the procedures thereunder constitute an independent exercise by the Commission of its own responsibilities, and not the performance of an action required by a mandate of this court.

Appellant probes further into the *Policy Statement's* provisions, however, and charges that the Review Board "so disregard *Miners,* pertinent record evidence, and its own precedents as to unlawfully change that *Policy.*" Those errors, appellant argues, were condoned and finalized by the Commission's failure to overrule the Board and "defend its stated policy" (Brief for Appellant at 8).

### III

In essence in the *Policy Statement* the Commission concluded that where an applicant's proposed 5 mv/m daytime contour would penetrate the geographic boundaries of any community with a population of over 50,000 persons and with at least twice the population of the applicant's specified community, a re-

---

1. Goodman Broadcasting Co., 11 P & F Radio Reg.2d 331 (1967); KWEN Broadcasting Co., 11 P & F Radio Reg.2d 903 (1967); and Boardman Broadcasting Co., Inc., 11 P & F Radio Reg.2d 566 (1967), Appellant's Brief at 9.

2. Miners Broadcasting Service, Inc., 121 U.S.App.D.C. 222, 349 F.2d 199, at 202 (1965).

3. *Ibid.*

4. 47 U.S.C. § 307(b) (1964) provides that "the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service * * *."

buttable presumption will arise that the applicant proposes to serve the larger community rather than his specified location.

WOWW, the applicant in this case is the only AM station operating in Naugatuck, it having commenced operation on February 25, 1961. Initially licensed as a Class II station on 860 kHz[5] with 250 watts power daytime only, directionalized, WOWW in the current proceeding sought to so revise its facilities as to permit its operation as a Class III[6] station on 1380 kHz with 5 kilowatts power daytime and 500 watts power nighttime. As an element of this change WOWW sought also to construct a third tower, to install a new transmitter, and to employ different directional antennas for day and night broadcasting. The Review Board's remand to the Examiner stated that the "WOWW proposal is presumptively one to serve Waterbury rather than Naugatuck" and required WOWW to rebut the presumption that it would, under its proposal for revised operation "provide a local transmission facility for its specified station location." *See* Review Board's Decision released July 7, 1967 (J.A. at 43). The record returned to the Review Board after the Examiner's further hearing established the following facts:

The population of Naugatuck is 19,511, while the population of Waterbury is 107,130. Although Naugatuck is contiguous to the southern limits of Waterbury, Naugatuck cannot be considered merely a residential or "bedroom" type of community. Naugatuck is a town and a borough of Connecticut. WOWW is the only radio station there, and the only television station is in adjoining Waterbury. Naugatuck elects its own mayor, elects its own Board of Burgesses, has its own police, fire and water departments, levies its own taxes and has its own schools, roads and highways. It has its own representatives in the state legislature, its own daily newspaper, its own churches, its own civic organizations, and (with Beacon Falls) its own community chest. It is a highly industrialized community with such enterprises, among others, as U. S. Rubber Company, Eastern Companies, Peter Paul Candy, Risden Manufacturing, Lewis Engineering, Butterfield Manufacturing Company, and Naugatuck Glass Company having plants located there. Some 8,689 persons are reported to be employed in its manufacturing plants and an estimated 50% of this labor force comes from surrounding communities including Waterbury (Tr. at 407–10, J.A. at 46).

■ Set forth in the Review Board's Decision released July 7, 1967, is a detailed and accurate summation of the facts and evidence upon which it bases its ultimate conclusions. The Decision enumerates as "Findings of Facts" 19 closely typed pages of discussion classified under headings which indicate and define the depth and the breadth of the Decision: "Engineering Factors," "Valley's Witnesses," "School Needs," "Industrial Needs," "Political Needs," "Local News Needs," "Religious Needs," "Controversial Issues," "Civic Needs," "Miscellaneous Needs," "Extent to which Naugatuck's Needs are Met by Outside Stations," "Extent to which Proposed Operation will meet Naugatuck's Unsatisfied Needs," "Sources of Advertising Revenues" and "Whether Valley's proposal could qualify as a Waterbury Station."

The Review Board in expressing its decision and explaining its reasoning carefully compared the evidence before it with the purpose and concern of the Commission's *Policy Statement.* The

---

5. The symbols kcs and kHz are synonymous, each meaning one thousand (kilo) cycles per second.

6. A Class III station is one which operates on a regional channel and is designed to render service primarily to a principal center of population and the rural areas contiguous thereto. A Class III-B station is a Class III station which operates with power not less than 0.5 kilowatts, nor more than 1 kilowatt night and 5 kilowatts daytime * * * 47 CFR § 73.21(b)(1)(ii)(1968).

Board pointed out that "The evidence at the further hearing establishes that there is an existing penetration of Waterbury's boundaries by WOWW's 5 mv/m contour so that 21.6% of the population and 34.4% of the area of Waterbury are included within that contour; *that WOWW's 2 mv/m contour now provides. primary service to 90.2% of the population, and 77.4% of the area of Waterbury;* that the proposed 5 mv/m contour would include 99.4% and 95.2% respectively of the population and area of Waterbury; and that the proposed 2 mv/m contour would provide primary service to the entire population and area of Waterbury. Thus, although a stronger signal would be placed over Waterbury by WOWW's proposal than by its existing operation, the primary service (2 mv/m) which would be rendered thereto by Valley's proposal would not be materially increased—the population receiving such service would be increased from 96,682 to 107,130, or by 10,448 persons" (J.A. at 68). The Review Board also considered evidence that WOWW's proposed operation "would provide a first local nighttime transmission facility to the 19,511 persons residing in Naugatuck, Connecticut; that during most of the nighttime hours 7,099 persons in an area of 5.6 square miles would receive a first primary service and 4,570 persons in an area of .4 square miles would receive a second, and during a limited number of nighttime hours, 1,995 persons in an area of 1.3 square miles would receive a first primary service and 2,914 persons in an area of 1.4 square miles would receive a second, all of these areas being located essentially within the city limits of Naugatuck and Waterbury, Connecticut (J.A. at 69). Upon this evidence the Review Board commented, "These strong public interest factors weigh heavily in favor of the grant of the proposal. The Commission has often said that service to underserved areas and populations is one of its objectives in the allocation of standard broadcast stations; grant of WOWW's application

would further that objective" (J.A. at 69). In granting the WOWW application for the changed facilities and broadcast hours to "serve the public interest, convenience and necessity" (J.A. at 70), the Board concluded "that the applicant's strong showing at the further hearing, together with the one made at the first hearing, adequately meets the applicant's burden with respect to the issues framed; that that showing affirmatively rebuts the presumption that WOWW's proposal 'is one to serve Waterbury rather than Naugatuck;' and that WOWW's proposal will in fact provide a realistic local transmission service for Naugatuck" (J.A. at 69).

To support appellant's charge that the Review Board disregarded its own precedents in approving the WOWW application our attention is invited to three cases in which it is alleged the rationale herein "conflicts radically" with the application of the *Policy Statement* to the facts in those cases, which are: Goodman Broadcasting Co., 11 P & F Radio Reg.2d 331 (1967); KWEN Broadcasting Co., 11 P & F Radio Reg.2d 903 (1967), and Boardman Broadcasting Co., 11 P & F Radio Reg.2d 566 (1967). There are of course factual variations in each of these cases and we conclude that in each of them as in the present case the Review Board in carrying out the Commission's concern as expressed in the *Policy Statement* was making a "full exploration of all relevant concrete evidence," KWEN Broadcasting Co., *supra* at 910. That application of the *Policy* both by the Review Board and the Commission to varying factual and technical situations will result in rulings both for and against applicants is inevitable. *See* WTOW Inc., 11 P & F Radio Reg.2d 1211 (1968); Wood and Watkins, 12 P & F Radio Reg.2d 97 (1968).

Although our outline of the evidence of record before the Review Board, as we have set it out above is at best skeletal we are convinced that the Review

Board[7] neither disregarded pertinent record evidence, nor its own precedents and consequently did not "change" the *Suburban Policy Statement.* It follows then that the Commission in adopting the Review Board Decision did not "avoid its obligation to correct the Board's errors and defend its stated policy" (Brief for Appellant at 8).

## IV

■ Appellant contends that irregularity appears in the record because the Review Board "placed great stress in its Decision on the fact that WOWW is an existing station." The contention cites an excerpt from the Decision: "Here we have an existing licensee [WOWW] with a prior record which has made a strong and convincing showing *based in substantial part, upon its past record;* in our view *that showing* (emphasis supplied in Brief for Appellant at 20) adequately rebuts the presumption raised by the moderately increased penetration of Waterbury by WOWW's proposed contours" and concludes that in so stating the Board held WOWW to "a more relaxed burden of proof" (Brief for Appellant at 19–20).

We observe that the quoted excerpt appears as the last sentence in paragraph "10" of the Board's "Conclusions" (J.A. at 68–9). We cannot however as appellant urges us to do, read or interpret this sentence as standing alone, separate and apart from the complete sequence of thought and reasoning which precedes it. Under the caption "Conclusions" the Board outlines the scope and concern of the Suburban Communities Program, defines correctly the burden of proof which the *Policy* places on intervenor as applicant, and accurately reviews the evidence before the Board and its relationship to the remand issues (J.A. at 65–70). This review follows substantially the headings enumerated under Part III of this opinion. Throughout paragraphs numbered "3" through "9" the Decision recapitulates the evidence in the several categories, concluding various paragraphs ·with expressions such as:

Further, the evidence adduced on the remand issues indubitably demonstrates that WOWW operating as proposed is designed to provide a realistic local transmission service for [Naugatuck] (J.A. at 26).

Not only will WOWW operating as proposed continue to serve these needs, [news, industrial, political, educational, religious, controversial, civic, and related matters] it will expand its service so as to more comprehensively meet them, and also to serve unsatisfied needs which it is now unable to do because of its daytime only hours of operation (J.A. at 26).

[O]utside stations are not now serving the separate and distinct needs of Naugatuck * * * (J.A. at 26).

Thereafter the Decision (J.A. at 68) discusses briefly whether WOWW's *present* operation raises the same presumption as does the proposed operation and concludes that the findings establish "beyond doubt" that present operations do not justify such a presumption. There follows a brief discussion by way of a comparison of past operations with proposed future operations. In the context of this comparison and citing from our opinion in Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994, 7 P & F Radio Reg.2d 2001 (1965), that a renewal applicant "must literally 'run on his record' " the Board, as quoted in the initial paragraph of this section of

7. We observe that one member of the Review Board dissented from the Decision released on July 7, 1967. In a petulant paragraph the dissent apparently is for the basic purpose of criticizing the Examiner's failure to make proper findings of fact. Although announcing a concurrence in exceptions filed by the Broadcast Bureau the dissent is aimed at "vehicles for sermons," "jewels of literary contrivance" and "the fires of creative genius." Whoever or whatever is the target of these arrows we find nothing in the dissent which enables us to evaluate its merits, if any.

this opinion, points to the strong showing made by WOWW upon its past record. Reading the challenged phraseology in the full context of the Decision we are satisfied that there was no relaxing of or misevaluation of the burden of proof. Our conclusion is fortified by the wording of the paragraph immediately following this challenged sentence where, in paragraph 11, (J.A.69) as quoted heretofore, the Board in summation of its findings pointed out that "under *all* the circumstances, the Board is of the view that the applicant's *strong showing at the further hearing*, together with the *one made at the first hearing*, adequately meets the applicant's burden * * *" (emphasis added).

It is further worthy of note that a very substantial portion of the applicant's evidence at the remand hearing was unrefuted by any contrary testimony and that appellant offered no evidence to refute a substantial portion of that testimony.

## V

■ Appellant's next objection to the Review Board's action is a contention that the Board erred in using WOWW's 2 mv/m contour in assessing the impact of the application upon the city of Waterbury and urges us to find that the only relevant consideration is the 5 mv/m contour which WOWW would propagate under its proposed operation. The thrust of this argument appears to be that the proposed operation would for the first time include all of Waterbury in WOWW's 2 mv/m coverage, and that under the Commission rules, this enables WOWW's daytime operation to qualify as a Waterbury station. Cited in support of this argument is Commission Rule 73.188.[8]

The Commission's answer to this charge is that the 2 mv/m contour of WOWW's proposed operation is par-ticularly pertinent in this case because the station's 2 mv/m or primary service contour as it presently operates reaches 90.2% of the population of Waterbury, while its proposed operation will reach 99.4% of that population with its 5 mv/m signal. The Commission has uniformly held that a signal of 2 mv/m is sufficient to provide primary service to any city whose population exceeds 10,000. S & W Enterprises, Inc., 37 F.C.C. 220 at 221 (1964); Home News Publishing Co., 4 P & F Radio Reg. 1444 (1950); Moline Broadcasting Corp., 5 P & F Radio Reg. 466 (1949). The Commission further states that whether a listener receives a 2 mv/m or a 5 mv/m signal really makes little difference because in areas away from heavy interference the reception from either signal is virtually the same.

■ We observe that the *Suburban Policy Statement* established a 5 mv/m coverage as raising the presumption that a suburban application would serve the larger city and consequently placed the burden of disproving that service upon the applicant. We must recognize also that the State of Connecticut, while relatively small, has a high density of population and that most of its 169 "towns" are in close proximity to each other. It seems obvious to us that the Commission's problems in attempting to afford satisfactory radio facilities to all of the populace in Connecticut are most difficult because of the virtual impossibility of licensing any station which will not on some compass bearing place a signal into abutting towns. It follows then that the criteria defined in the *Policy Statement* as considerations to determine the applicant's ability to overcome the presumption cannot be so inflexible as to be practical only in one set of physical circumstances. This then brings us to a required recognition of the Commission's expertise in a field where

---

8. Rule 73.188 "Location of transmitters * * * (b) The site selected should meet the following conditions: (1) A minimum field intensity of 25 to 50 mv/m will be obtained over the business or fac-tory areas of the city. (2) A minimum field intensity of 5 to 10 mv/m will be obtained over the most distant residential section." 47 C.F.R. § 73.188 (1968).

its experience, technical, and engineering knowledge enable it to deal with these problems at a level of understanding and comprehension above that of the court. We find nothing in the *Policy Statement*, or in any case that we have reviewed which forecloses the consideration by the Review Board or the Commission of other markers or measures of area penetration than the 5 mv/m contour. As we said in Sunshine State Broadcasting Co., Inc. (WBRD) v. FCC, 114 U.S.App.D.C. 271, 273, 314 F.2d 276, 278 (1963), "The question * * * is, we think, one which is to be answered by the Commission which has the expertise essential to its determination. The court should not substitute its judgment in such a technical matter for that of the expert agency, unless it appears that it has acted arbitrarily. That does not appear here."

## VI

Appellant charges that the Commission acted arbitrarily in denying review, thereby depriving it of any opportunity to brief and argue to it the alleged errors of the Review Board. This attack basically reargues factual matters which we have already discussed in tedious detail, augmented by some reliance upon the "incomplete satisfaction" expressed by Commissioner Cox in his concurring statement (J.A. at 96). Despite the fact that this was apparently the first case to come before the Commission on an adjudicatory record involving the *Suburban Policy*, we do not feel the Commission's action was arbitrary. The Review Board's Decision was detailed, comprehensive and expansive in its discussion of the evidence and the relative weight it attached thereto, and concise and precise as to its ruling and the reasons therefor. Ap-

pellant's application for review, filed August 7, 1967, in substantial detail informed the Commission of the areas of alleged error (J.A. at 76–94). The record before the Commission was complete as to the facts, the issues, the evidence, and the allegations of error. Appellant's petition to review is in its legal significance and value for the purposes of this case identical to a motion or petition for rehearing. "It has been almost a rule of necessity that rehearings were not matters of right, but were pleas to discretion. And likewise it has been considered that the discretion to be invoked was that of the body making the order, and not that of a reviewing body. * * * The rule that petitions for rehearings before administrative bodies are addressed to their own discretion is uniformly accepted and seems to be almost universally applied in federal courts." ICC v. City of Jersey City, 322 U.S. 503, at 514–515, 517, 64 S.Ct. 1129, 1135–1136, 88 L.Ed. 1420 (1944) and cases cited therein. "Except in the single instance, it has been held consistently that rehearings before administrative bodies are addressed to their own discretion. * * * Only a showing of the clearest abuse of discretion could sustain an exception to that rule." United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, at 535, 66 S.Ct. 687, 697, 90 L.Ed. 821 (1945). We find no such abuse of discretion on the Commission's part.[9]

Collaterally appellant asserts that the Commission's action denying review is in error because it failed to state the grounds for so doing as required by the Administrative Procedure Act.[10] The purpose of this section of the Act is obviously "to furnish the parties and the reviewing court with a sufficiently clear basis for understand-

---

9. *See also* RCA v. United States, 341 U.S. 412, 71 S.Ct. 806, 95 L.Ed. 1062 (1951); Mitchell v. Fischer, 110 U.S.App.D.C. 316, 293 F.2d 155 (1961).

10. "Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of

an interested person made in connection with any agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial." 5 U.S.C. § 555 (e) (Supp. II 1965–66).

ing the premises used by the tribunal in preparing its conclusions of law, adjudications, and orders." Gilbertville Trucking Co., Inc. v. United States, 196 F.Supp. 351, at 359 (D.Mass.1961). It takes but the most cursory examination of the Review Board's Decision for this court to determine the exact basis and reasons for the findings and rulings of the Board. The Decision, as we have heretofore pointed out, amply reviews the evidence, sets forth detailed findings of fact, and in all other respects complies with the pertinent provisions of the Administrative Procedure Act. The Decision contains all findings needed to fully apprise the court of the essential basis of the Commission's decision. The Decision having met all required provisions of the Administrative Procedure Act it was permissible for the Commission to affirm and adopt it, as it did. *See* North American Van Lines, Inc. v. United States, 217 F.Supp. 837 (N.D.Ind. 1963). The provisions of the Act having been fully complied with it was useless and meaningless for the Commission to restate the Decision or to further particularize the issues. *See* Key v. United States, 263 F.Supp. 544 (S.D.Ind.1966).

### VII

In a blanket assertion of error appellant next charges that the evidence presented by Intervenor on the Review Board's initial remand to the Examiner was "insufficient" to relent the presumption created by the *Suburban Policy Statement.* Our discussion heretofore of the evidence accepted by the Examiner which constituted the record before the Review Board negates our acceptance of this contention. We point out, however, that Intervenor applicant presented the testimony of WOWW's president and general manager, a consulting engineer and four citizens of Naugatuck, including the mayor, the superintendent of schools, the president of the Chamber of Commerce and a factory manager. Appellant's evidence was built upon the testimony of an officer of each of two area radio stations (Tr.

at 270–736). A very substantial portion of intervenor's evidence is uncontroverted and appellant's challenge sounds in criticism rather than refutation. We find the record to contain an abundance of evidence completely adequate to support the Board's Decision and the Commission's Memorandum, Opinion and Order.

### VIII

Laced through Appellant's assertions of error are two additional points which require comment. It is alleged that there is some irregularity arising from the fact that the lobe of WOWW's daytime proposed operation is thrust northwestward over Waterbury rather than southeastward over Naugatuck, contrasted to the nighttime operation when the directional antenna would radiate its major lobe to the southwest. The Review Board summarized the evidence upon this situation under the heading "Engineering Factors" (J.A. at 46–49) and concluded that "These day and night patterns are largely dictated by the protective requirements of other co-channel and adjacent channel operations." (J.A. at 46.) We find nothing in the record which establishes this finding as erroneous.

Collateral to this contention is Appellant's challenge to the Commission's approval of an increase in WOWW's power from 250 watts to 5 kilowatts daytime and 500 watts nighttime. The most ready and concise answer to this objection is set forth in the concurring statement of Commissioner Cox accompanying the Commission's Opinion and Order. "The existing operation on 860 Kc is daytime only. To obtain a nighttime facility obviously required a change in channels and, the one found to be available for nighttime use in this area, 1380 Kc, because of propagation characteristics, requires higher power in order to achieve a daytime coverage anywhere comparable to that obtained with the present facility. Added to this is the fact that on the new channel, daytime protection of other stations requires

a different directional pattern than that presently in use" (J.A. at 96).

At oral argument of this case before this court, intervenor's counsel advised the court, without challenge by appellant's counsel, that due to the physical phenomenon associated with frequency a less efficient propagation results at a higher frequency and that consequently the change in WOWW's frequency from 860 kHz to 1380 kHz required a substantial increase in power. Illustration of this principle is contained in the Commission's several graphs defining its "Standard Broadcast Technical Standards" 47 CFR § 73.184 (1968).

We note in passing that in order to permit WOWW to operate at night a change of frequency was required by 47 CFR § 25, subpart C (1967) under an agreement with Canada which the Commission was bound to observe, and which made the current 860 kHz frequency available only for daytime use in Naugatuck.

### IX

■ The Review Board first, and the Commission by and in its approval of the Board's Decision observed all procedural requirements, considered the issues, reached reasoned conclusions supported by substantial evidence and rendered reasoned judgment. It is not our function or authority to superimpose our opinion upon the legitimate proper action of an administrative agency. Tampa Times Co. v. FCC, 97 U.S.App.D.C. 256, 230 F.2d 224 (1956) and Pinellas Broadcasting Co. v. FCC, 97 U.S.App.D.C. 236, 230 F.2d 204, cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956). We find in this case that the Commission's actions in granting the application of WOWW were neither arbitrary nor capricious, that those actions conformed with applicable Commission policy and law, that the Commission did adequately set forth the basis for its actions, and finally that those Commission actions were supported by substantial evidence of record.

Affirmed.

McGOWAN, Circuit Judge (concurring separately):

I think the only difficult issue in this case arises from petitioner Northeast's contention that the Review Board failed to take proper account of Naugatuck's intention to use unnecessarily high power, the maximum available to a class III–B station. This argument finds solid support in two recent decisions of the Commission—Monroeville Broadcasting Co., 12 F.C.C.2d 359 ——, P & F Radio Reg.2d —— (1968), and The Tidewater Broadcasting Co., 12 F.C.C.2d 471, —— P & F Radio Reg.2d —— (1968). The decisions in both cases rested heavily on the applicants' efforts or lack of effort to tailor their power to the needs of the designated suburban community. And the Commission explicitly rejected the argument, made in the instant case by the Commission's counsel, that the applicant's burden of proof in rebutting the presumption does not vary with the intensity of the proposed power and extent of city coverage.

That the Review Board in this case shared that discredited view, however, is indicated by its rejection, as "not of decisional significance," of Northeast's specific objections to Naugatuck's allegedly excessive 5000 watts. This objection is not met simply by saying, as did the Board, that the high wattage "would result in the efficient and equitable utilization of the frequency." Nor is the Board's observation that WOWW would gain only 10,000 Waterbury listeners receiving a 2 mv/m signal wholly responsive to the charge that 100% coverage of Waterbury with a much stronger signal belies the professed intention to serve the suburb and not the city.

Were the Review Board's decision the only Commission action before us, I would remand for further consideration of this critical issue. However, there is an indication in the record that the Commission addressed itself to the applicant's high power and was satisfied that the proposal was not excessive. Thus, Commissioner Cox, concurring in the denial

of the application for review, noted that the shift from 860 kc to 1380 kc required an increase in power in order to achieve a signal of comparable intensity. There seems to be no dispute that 1000 watts was inadequate for this purpose. And Naugatuck in its brief and at oral argument has represented to the court, without contradiction by Northeast or the Commission, that "under Commission rules, no new grants are made for intermediate powers between 1 kw and 5 kw." Perhaps this is what the Review Board had in mind by its cryptic reference to efficient use of the channel. In any event, because the Commission could rationally accept this explanation in rebuttal of the presumption, I concur in affirming the grant of Naugatuck's application.