**WOODLAND BROADCASTING COMPANY, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Felix Joynt and James Joynt, d/b as KWEN Broadcasting Company, Intervenor.

No. 22264.

United States Court of Appeals District of Columbia Circuit.

Argued March 26, 1969.

Decided June 6, 1969.

Mr. Harry M. Plotkin, Washington, D. C., with whom Messrs. Gene A. Bechtel, Washington, D. C., and William L. Fishman, Washington, D. C., were on the brief, for appellant.

Miss Katrina Renouf, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, and John H. Conlin, Associate General Counsel, and Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, were on the brief, for appellee.

Mr. Eugene L. Burke, Washington, D. C., was on the brief for intervenor.

Before FAHY, Senior Circuit Judge, and WRIGHT and ROBINSON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

Woodland Broadcasting Company is here appealing from an action of the Federal Communications Commission granting a radio broadcasting license in the Beaumont, Texas area to Station KWEN instead of Woodland. Specifically, Woodland protests the application by the Commission of its Policy Statement on Section 307(b) Considerations for Standard Broadcast Facilities Involving Suburban Communities, 2 F.C.C.2d 190 (1965), to the Woodland and KWEN proposals. We hold that the *Policy Statement* was appropriately applied, and accordingly we affirm the action of the Commission.

**I**

The *Policy Statement* was issued by the Commission partly in response to the opinion of this court in Miners Broadcasting Service, Inc. v. F. C. C., 121 U.S.App.D.C. 222, 349 F.2d 199 (1965). Under Section 307(b) of the Communications Act[1] the Commission, in considering mutually exclusive applications for a license, is to consider the respective communities which each applicant is intending to serve, with an eye to insuring the "fair, efficient, and equitable distribution of radio service." The problem in *Miners* was that the Commission had before it two suburban Pittsburgh proposals, yet the Commission proposed to treat one applicant as being from the suburb and the other as being from Pittsburgh. Since the suburb had no other local stations, the "suburban" applicant was accorded a priority over the other applicant, which would have been Pittsburgh's ninth station. We remanded to the Commission for a statement of

reasons for differentiating between what appeared to be two similar suburban applications.

After hearings on several proposals for handling the suburban problem, the Commission adopted the *Policy Statement*. The *Policy Statement* was designed as an expeditious method for distinguishing in the first instance between a true suburban station and one which, though physically located in a suburb, would actually serve the central city. A presumption was created in which an applicant whose proposal would have a 5 mv/m daytime signal contour which would penetrate the boundaries of any community with a population of over 50,000 persons and with at least twice the population of the applicant's designated suburban community would be presumed to be serving the larger community.[2] The *Policy Statement* recited as a major reason for its adoption the Commission's experience that stations in small communities whose signals penetrated larger ones tended to lose their local character and become substandard stations for the larger community. The *Policy Statement's* presumption was intended to discourage such stations.

The Commission also intended the *Policy Statement* to be a flexible tool. Thus the presumption is rebuttable. A station coming within the presumption is entitled to offer evidence showing that it is in fact primarily intending to serve its specified community. In a number of instances stations have successfully rebutted the presumption, sometimes without the necessity for a hearing.[3] Further, an applicant may bring a competing applicant within the presumption, despite the fact the latter did not meet the statistical requirements thereof, by making a "threshold showing" that the competing applicant will realistically serve primarily the larger

---

1. 47 U.S.C. § 307(b) (1964).

2. *See* Northeast Broadcasting, Inc. v. F. C. C., 130 U.S.App.D.C. 220, 222, 400 F.2d 749, 751 (1968).

3. *See, e. g.*, Monroeville Broadcasting Co., 12 F.C.C.2d 359 (1968), affirmed, *sub nom.* Miners Broadcasting Service, Inc. v. F.C.C., D.C.Cir., No. 21,937, decided March 20, 1969 (unreported) ; Donnelly C. Reeves, 6 F.C.C.2d 531 (1967).

community rather than his specified one.[4] And the *Policy Statement* has been applied even where there are no competing applications; in other words, it is a threshold requirement of Section 307(b) eligibility for a license. Any applicant who comes within the presumption's terms must rebut the presumption before he can be considered for the license. Thus no problem of comparative consideration arises until at least two applicants are free of the presumption.

This court has twice passed on the *Policy Statement*. In Northeast Broadcasting, Inc. v. F. C. C., 130 U.S.App.D.C. 278, 400 F.2d 749 (1968), we affirmed the Commission's finding that a station in Connecticut which sought to expand its facilities had rebutted the presumption.[5] And in Miners Broadcasting Co. v. F. C. C., D.C.Cir., No. 21,937, decided March 20, 1969 (unreported), the original case which prompted the *Policy Statement* came back to us after the remand; the Commission found that both applicants came within the presumption, and that one had adequately rebutted it. Accordingly, the Commission awarded the license to that applicant, and we affirmed.

With this background, we turn to the facts of the present case.

## II

The city of Beaumont, Texas, lying in the southeast part of the state, has a population of 119,175. Five miles to the south is the community of Port Arthur, whose population, 66,676, is more than half that of Beaumont. Two miles to the northeast of Beaumont is the community of Vidor, with a population (about 8,000) considerably less than half that of Beaumont.

In 1962 two applicants proposed mutually exclusive facilities in the Beaumont area. One was KWEN, proposing to operate out of Port Arthur; the other was a station proposing to operate out of Vidor. The Vidor applicant withdrew, and pursuant to Commission rules[6] a published invitation was issued for new applicants to replace the Vidor applicant. The new applicants were specifically to protect the interest of Vidor. Woodland responded, and a comparative hearing was had between it and KWEN.

The examiner found that both applicants' signals would cover virtually the entire Beaumont-Port Arthur-Vidor area, and that both would provide programming of general interest to the area. Working under the pre-*Policy Statement* guidelines, he concluded that no priority would be given to either station based on a comparison of communities under Section 307(b). He then heard evidence on the merits of the respective managements, and recommended that Woodland be granted the license.

KWEN appealed to the Commission's Review Board. While the appeal was pending, the Commission issued the *Policy Statement*, holding that it applied to all pending applications. The Review Board noted that Woodland came within the *Policy Statement* presumption, but KWEN (because Port Arthur was more than half the size of Beaumont) did not. It ordered a remand to determine whether Woodland could rebut the presumption. The Commission affirmed the Review Board's order for a remand.[7]

4. Final paragraph of *Policy Statement*, 2 F.C.C.2d at 194.

5. We there pointed out the flexibility which must inhere in application of the *Policy Statement*. 130 U.S.App.D.C. at 286, 400 F.2d at 757. The detailed opinion in *Northeast* repeatedly referred to, and approved, the Commission's administration of the *Policy Statement*.

6. 47 C.F.R. § 1.525 (1969).

7. Woodland asked the Commission for permission to amend its engineering to meet the technical requirements for a Beaumont city station. The Commission refused, noting that it had allowed Woodland to enter the proceedings on the basis that it would come in as a Vidor station. The Commission did permit Woodland to amend its engineering to improve its chances as a Vidor applicant. Woodland did not do so, and on the remand resubmitted its original proposal.

On the remand the examiner found that Woodland had rebutted the presumption.[8] KWEN again appealed to the Review Board, and the Board reversed, holding that Woodland had not adequately rebutted the presumption.[9] Woodland does not here contest this finding, and now concedes that if application of the *Policy Statement* is appropriate in this case, then Woodland is disqualified. Further, Woodland did not attempt to make a "threshold showing" that KWEN was really a Beaumont station, and accordingly KWEN has not had

to rebut the presumption which such a showing would have created.[10]

Because Woodland was disqualified, and because KWEN was found in all respects to be qualified as a Port Arthur station, the broadcast license was awarded to KWEN. The Commission denied Woodland's application for review,[11] and Woodland has brought this appeal.

### III

Woodland's basic argument is that the *Policy Statement* is arbitrary when applied to the facts in this case.[12] The

The initial decision of the examiner and the decision of the Review Board ordering a remand are reported at 3 F.C.C. 2d 186, 198 (1966). The Commission's decision is found at 3 F.C.C.2d 958, 960 (1966).

8. 10 F.C.C.2d 767 (1967).

9. 10 F.C.C.2d 753 (1967).

10. Thus KWEN, like all applicants (unless they come within the presumption), is presumed to serve the local community which it has specified. There is evidence, and Woodland apparently does not contest it, that KWEN will serve the local needs of Port Arthur.

11. F.C.C. Order 68–805, August 2, 1968.

12. Woodland also argues that the Commission should have allowed Woodland to amend its engineering to meet the requirements of a Beaumont station. *See* Note 7 *supra*. However, since Woodland was allowed to enter the proceedings as a protector of Vidor's interest, and since it specified its location as Vidor, we do not think it was an abuse of the Commission's discretion to hold it to its original specification as a Vidor station.

Further, Woodland intimates that from the Commission's past applications of the *Policy Statement*, including the granting of exceptions to the presumption, we should infer that an exception was warranted here. Actually, there has been only one instance where the Commission failed to apply the presumption to a station which would otherwise have come within it. Grace Broadcasters, Inc., 6 F.C.C.2d 533 (1967). That case presented a unique situation of a religious station which proposed to locate its transmitter on special property which it owned. Further, the cryptic opinion of the Commission in that case might well be read

to be simply a finding that the presumption was rebutted, despite the statement in the opinion that the Commission was not applying the presumption.

In Big Chief Broadcasting Co. of Tulsa, Inc. (KTOW), 4 F.C.C.2d 148 (1966), the Commission determined that the policy of allowing stations of a certain power (Class IV) to expand somewhat their signal strengths (this policy was codified as an amendment to Rule 73.28 (d)(3), 47 C.F.R. § 73.28(d)(3) (1969)) meant that when a station took advantage of such expansion it should be exempt from the *Policy Statement*.

In Harriscope Broadcasting Corp. (KTWO), 5 F.C.C.2d 723 (1966), the Commission simply declined to *extend* the presumption to a station which did not meet the statistical requirements; further, that case involved (as did *Big Chief*, *supra*) a conflicting policy of the Commission (in *Harriscope*, bringing service to white areas) which was held to be prevalent.

Finally, Woodland argues that the equities of the situation dictate a waiver for Woodland. Specifically, it claims that, since the Commission invited Woodland to participate as a Vidor station, it was unfair to change the rules in midstream and require it to rebut the presumption. This stands everything on its head. First, it is Woodland's basic argument, *see* text *infra*, that it really is an area-wide station, *not* a Vidor station. Second, it does not appear to us unfair for the Commission to invite Woodland in as a Vidor station, then to apply a formula, based on its reasonable experience, which indicates that Woodland really is not a Vidor station, and, having applied the presumption, require Woodland to prove that it really is what it claimed to be—a Vidor station. The fact that other stations have rebutted the presumption, *see* Note 3 *supra*, makes it clear that Woodland was not asked to do an impossible act.

reasoning is that prior to the *Policy Statement* both KWEN and Woodland were treated alike; the examiner found that both were area-wide in their signal reception and in the service they were offering. On a comparison of the two stations, he recommended that Woodland be granted the license. Yet, the argument continues, despite the basic similarity of the stations, the *Policy Statement* works arbitrarily to differentiate the two, disqualifying Woodland.

The answer to this argument, however, is, first, that the underlying premise of the *Policy Statement*—that small-town suburban stations tend to be deficient in that they take on the character of, and serve, the larger community—is certainly a reasonable conclusion in light of the Commission's experience; second, that the statistical formula is a reasonable attempt to define the group of stations likely to suffer from this deficiency; and third, that the presumption does not automatically qualify or disqualify anyone.

■■ There is no question that the Commission can take reasonable steps to cure the malady it has found exists: small suburban stations tending to become substandard city stations. Thus the question is whether the statistical premises and the presumption are rational means intended to effect this cure. We cannot say that it was arbitrary for the Commission to have erected the statistical test embodied in the *Policy Statement*. The Commission arrived at this test after hearing testimony and argument in three proceedings, and after rejecting a different test.[13] The purpose of the *Policy Statement*, and the suggestion in our original *Miners* opinion, was to provide an expeditious and rational method of differentiating between local stations and substandard suburban ones. Thus a statistical test, if rational, is a useful tool, even though any statistical test would, of course, be open to the charge that it was arbitrary. We think this test, based on the Commission's practical experience, meets the requirements of rationality.

Moreover, the presumption which may arise from an application of the test is a reasonable one. Here all the presumption does is require Woodland to put on proof that it will in fact be a local Vidor station. As indicated, this presumption has been rebutted by others, and is not an insurmountable or even a very difficult task—for a truly local station.[14] Thus the presumption is not only a reasonable one, but it is not unduly burdensome.

■ In sum, we find that the *Policy Statement* is a rational and useful method of identifying potentially substandard stations. Further, the facts of this case, rather than argue for arbitrariness, illustrate the reasonableness of the presumption. Port Arthur itself has more than 50,000 population. The examiner found:

"* * * Oil refining and chemical production are its basic industries. It has its own city government with a mayor, commission, and city manager. The Port Arthur News is a daily and Sunday journal and the city also has an art gallery, a public library, and Port Arthur College. There are two standard broadcast stations, two FM stations, and one television station assigned to the city."

13. *See* discussion in *Policy Statement*, 2 F.C.C.2d at 190–192.

14. Further, Woodland could have brought KWEN within the presumption, if KWEN was not a local Port Arthur station, by making some initial showing that KWEN was primarily a Beaumont station. This would not help Woodland get the license, since it was found disqualified by the presumption. However, it would have prevented what Woodland is claiming is the injustice of this case— that an area-wide station identical with Woodland is getting the license. If Woodland brought KWEN within the presumption, and if KWEN were also found to be essentially a substandard Beaumont station, then neither KWEN nor Woodland would be eligible for the license. This, presumably, would be in the public interest, since the Commission has determined that substandard central-city stations should be discouraged.

3 F.C.C.2d at 200. By contrast, Vidor is a small town: "Of the 2,380 workers in the Vidor area, 325 work there, 1,150 work in Beaumont, and 365 work in the Beaumont vicinity." *Id.* at 201.

It does not seem unrealistic to infer that a Port Arthur station will really intend to serve the substantial Port Arthur community, while a station located in Vidor may well become a satellite to the city of Beaumont which is the business and cultural center for the residents of Vidor. The *Policy Statement* allows Woodland to rebut this inference; this it failed to do. We think the Commission's use of the *Policy Statement* here was reasonable.

The Commission's action is

Affirmed.